IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO,
EASTERN DIVISION

| | |
|---|---|
| **Amie L. Morningstar**<br>410 South Court<br>Circleville, Ohio 43113<br><br>    **Plaintiff**<br><br>-vs-<br><br>**Circleville Fire & EMS Department**<br>586 North Court Street<br>Circleville, Ohio 43113<br><br>    and,<br><br>**City of Circleville**<br>133 S. Court Street<br>Circleville, Ohio 43113<br><br>    and,<br><br>**Marc Zingarelli**<br>147 Nicholas Drive<br>Circleville, OH 43113<br><br>    **Defendants.** | Case No.:<br><br>Judge:<br><br>**JURY DEMAND ENDORSED HEREIN** |

### VERIFIED COMPLAINT FOR DAMAGES AND
### A TEMPORARY RESTRAINING ORDER/PRELIMINARY INJUNCTION

I. INTRODUCTION

    1.    This action is a civil rights action brought by the Plaintiff against her employer for multiple acts of sexual harassment, retaliation, and sex discrimination. Plaintiff notified her superiors of the sexual harassment and discrimination to which her co-workers were subjecting her. Instead of attempting to remedy the discrimination and harassment, the discrimination and harassment persisted, and became worse as Plaintiff's attempt to remedy the same resulted in retaliation. In addition to Plaintiff's claims under federal law, Plaintiff's action also includes claims under Ohio state statutory and common laws.

## II. PARTIES AND JURISDICTION

2. At all times relevant herein, Plaintiff, Amie L. Morningstar ("Plaintiff" and/or "Ms. Morningstar"), has resided in the County of Pickaway, State of Ohio.

3. At all times relevant herein, Defendant, Circleville Fire & EMS Department, (hereinafter referred to as "CFD") is an entity authorized to do business in the State of Ohio, including, but not limited to, engaging in actions as a support system for all public safety services that cover Pickaway County.

4. CFD employs four (4) or more employees with the State of Ohio, and therefore Defendant CFD is an "employer" as defined by the Ohio Revised Code Section 4112.01(A)(2).

5. At all times relevant herein, Defendant, City of Circleville ("Circleville"), is a municipality of the State of Ohio.

6. Circleville employs four (4) or more employees with the State of Ohio, and therefore Defendant Circleville is an "employer" as defined by the Ohio Revised Code Section 4112.01(A)(2).

7. Defendant Marc Zingarelli is the Fire Chief for CFD; he resides in Circleville, Ohio.

8. At all times relevant herein, Plaintiff was a member of a protected class on the basis of her sex/gender.

9. This Court has jurisdiction over the claims under 28 U.S.C. § 1331 because the action arises under the laws of the United States and involves federal questions based, including, but not limited to, those related to the Equal Pay Act. This Court also has pendent jurisdiction of state law claims pursuant to 28 U.S.C. § 1367.

10. Jurisdiction is proper as the Causes of Actions are brought pursuant to the laws of the United States and/or utilize the same core of operative facts and is, therefore, subject to supplemental jurisdiction pursuant to 28 U.S.C. § 1367.

11. Venue lies in the Southern District of Ohio because the facts leading to the dispute between the parties occurred in Pickaway County, Ohio, within this District, and the Defendants are doing business in this District.

## III. GENERAL ALLEGATIONS

12. Ms. Morningstar began volunteering with Circleville Emergency Medical Services in 2001 and continued to volunteer until 2007.

13. Ms. Morningstar began Fire School in the fall of 2003 and obtained her professional fire certification in December, 2003.

14. Upon information and belief, Circleville Emergency Medical Services and Circleville Fire Department began to merge between the years of 2003-2005.

15. Ms. Morningstar applied to volunteer for Circleville Fire Department during this merger period between Circleville Emergency Medical Services and Circleville Fire Department.

16. Upon information and belief, sometime in 2003 Ms. Morningstar's volunteer applicant group was the only group required to endure a physical test. During Ms. Morningstar's process to become a volunteer Firefighter with Circleville Fire Department, the applicant group was required to do the same physical agility as the Full Time Firefighters. This was never done in years prior to Ms. Morningstar's applicant group and never done after Ms. Morningstar's applicant group.

17. After Ms. Morningstar passed the physical agility test and approved as a volunteer firefighter, she never received fire fighter equipment and/or gear after despite completing all tasks given to her and that the other volunteers had received their gear.

18. Ms. Morningstar never received her fire fighter equipment and/or gear despite the fact that she was told on several occasions that she would receive her fire fighter equipment and/or gear. Additionally, despite Ms. Morningstar's best efforts, she did not obtain fire fighter equipment and/or gear, nor was she permitted to go on a fire run with the fire truck. At the same time, other male volunteer firefighters were riding on the fire trucks and completing fire duties. Ms. Morningstar was only permitted to take EMS calls.

19. Upon information and belief, Chief Tener and/or Captain Kirk Edgington were responsible for determining whether or not Ms. Morningstar received her fire fighter equipment and/or gear.

20. Ms. Morningstar was a volunteer Fire Fighter/EMS at Pickaway from 2003-2007.

21. Ms. Morningstar was a part time paid firefighter and medic with Harrison Township from 2005 until sometime in 2010 or 2011.

22. In 2005, Ms. Morningstar attempted to become a full-time Firefighter/Medic with CFD but was passed over on her first attempt. The individual that was hired over Ms. Morningstar had no fire certification nor did he

have any EMS certifications. After this individual was hired and on payroll, the CFD put him through Fire and EMT school.

23. At the time Ms. Morningstar applied to CFD she already had her "240" fire certification and had been an advanced EMT for six years with the city as a volunteer.

24. Upon information and belief, the City of Circleville altered the physical agility test making it more difficult. Subsequent to Plaintiff's completion of the physical agility test, Captain Edgington commented "looks like it's time to make this test harder." Also during the physical agility, all three of the male candidates completed an action that was considered a "disqualification" factor, however the three males nevertheless passed the physical agility test.

25. Ms. Morningstar was hired by the City of Circleville as a full time Firefighter/Medic after her second attempt to become a full time Firefighter/Medic with Circleville in 2007.

26. Upon information and belief, Captain Jeff Wise stated in the Structured Panel Interview Candidate Evaluation Form while grading Ms. Morningstar, "I feel that it is time for the dept to see if we can handle the pressure of a lady on the 24 hour shift and as a total firefighter/EMT." This statement is in Ms. Morningstar's personnel file.

27. Upon information and belief, Captain Edgington stated in the Structured Panel Interview Candidate Evaluation Form while grading Ms. Morningstar, "questions six and eight on the interview indicate potential problems with supervisors and how should deal with the situation." This statement is also in Ms. Morningstar's personnel file.

28. Ms. Morningstar was placed on a 90-day probation upon being hired; the standard probationary period is 30 days for a new firefighter. Ms. Morningstar was the only individual placed on a 90-day probation period. Another volunteer was hired after Ms. Morningstar and he was not placed on a 90-day probation period. At least two other firefighters discussed this unfair treatment with the Chief of CFD and warned him that it was discrimination against Ms. Morningstar but the 90-day probation period was not lifted or adjusted. No other firefighter before or after Ms. Morningstar has ever been placed on a 90-day probation period when they first started with CFD.

29. Ms. Morningstar was hired on February 19, 2007. On this date she received her fire fighter equipment and/or gear for the first time, despite previously being affiliated with the Fire Department in a volunteer role.

30. After becoming a full-time Fire Fighter with CFD, Ms. Morningstar had portions of fire fighter equipment and/or gear missing on several occasions.

31. After becoming a full-time Fire Fighter with CFD, Ms. Morningstar had apparel taken from her belongings at CFD by an unknown individual(s), who had access to CFD.

32. After becoming a full-time Fire Fighter with CFD, Ms. Morningstar had gloves and nomex hoods taken from her belongings at CFD by an unknown individual(s), who had access to CFD on multiple occasions.

33. After becoming a full-time Fire Fighter with CFD, Ms. Morningstar found the screws loosened around her "warning lights" on her SCBA mask (this lets a firefighter know when they are running out of air), the screws were also loosened around her voice box which allows her to communicate. She discovered this when gearing up on a fire call as she placed her mask on her person and all of the pieces came off. She has also experienced air being released on her tank and batteries missing out of her voice box on occasion.

34. After becoming a full-time Fire Fighter with CFD, an unknown individual(s) urinated in Ms. Morningstar's shampoo bottle.

35. After becoming a full-time Fire Fighter with CFD, Ms. Morningstar discovered semen and/or some other bodily fluid on her bunk blanket at CFD.

36. After becoming a full-time Fire Fighter with CFD, Ms. Morningstar discovered that the armpits were cut out of her shirts as well as other portions her apparel.

37. After becoming a full-time Fire Fighter with CFD, Ms. Morningstar's radio, which is a firefighter's lifeline, was missing and it was missing for a number of months at one point.

38. Ms. Morningstar's radio was eventually found hidden behind Captain Edgington's bookshelf.

39. On September 19, 2012, Lt. Bradley Rankin (who is currently a Captain) filed an incident report with the City of Circleville and CFD regarding the harassment of Ms. Morningstar.

40. Lt. Rankin's incident report detailed, with photographs, evidence from July 2012 that her comforter had multiple stains "of a light color." Lt. Rankin stated that the substance is unknown but meant to have the appearance of a bodily fluid.

41. In August 2012, a report was made to both Lt. Rankin and Captain Jeff Wise regarding Ms. Morningstar's sock as the toe section had been cut out of the sock.

42. In the Spring of 2015, when it came time for promotional testing for the Lieutenant position, Chief Zingarelli told Ms. Morningstar on multiple occasions not to bother testing as he insisted that there was no point in Ms. Morningstar taking the test, as she would not pass.

43. Prior to the test, Chief Zingarelli advised Ms. Morningstar that Firefighter Scott Cavanaugh would get the promotion to Lieutenant, which he ultimately did receive.

44. Ms. Morningstar believed that the test would be generated and graded by Chiefs and officers outside of the CFD to ensure fairness.

45. On or about March 8, 2015, the CFD applicants were given thirty-day notice of the test and a copy of study materials was left at the firehouse for the firefighter's use and preparation for the test. In addition to the study materials at the Fire Department, Ms. Morningstar purchased her own materials so she could study at home as well.

46. While waiting her turn to take the oral board, Chief Zingarelli called Ms. Morningstar a bitch in front of the Optimal testing agency.

47. Ms. Morningstar allegedly failed the test; however, she has been unable to obtain a true and accurate copy of the results of said examination.

48. Ms. Morningstar was placed on 3 unit after the exam. While at her first day on 3 unit, Captain Edgington informed Ms. Morningstar that he comprised and graded the test, which, upon information and belief, is contrary to Defendants' course of dealings.

49. Captain Edgington also informed Ms. Morningstar that he could see why she failed because she was never on his shift and does not know how he runs things.

50. Between 2014-2015, Ms. Morningstar endured inappropriate sexual advances from Jerry Cornwell, a Circleville City employee.

51. On August 18, 2014, Ms. Morningstar made a complaint to Lt. Rankin regarding inappropriate sexual advances from Mr. Cornwell in the front office of CFD.

52. Ms. Morningstar stated that Cornwell called her to the front office and while discussing some paperwork, pulled Ms. Morningstar to him, forced an embrace and tried to kiss her.

53. Jerry Cornwell, in another incident, grabbed Ms. Morningstar by the waist and inappropriately placed his head on her chest. Ms. Morningstar attempted to pull away but Cornwell would not allow her to move.

54. On February 27, 2015, Ms. Morningstar requested information from Lt. Rankin on how to file a complaint regarding Jerry Cornwell.

55. A meeting was held on February 27, 2015 to address the aforementioned harassment. Ms. Morningstar, Captain Jeff Wise, Lt. Jeff Moorehead, Interim Chief Marc Zingarelli were present. Ms. Morningstar informed Chief Zingarelli, Lt. Moorehead and Lt. Wise that she did not want to be present when Mr. Cornwell was in the Department.

56. At the meeting, Ms. Morningstar was told not to tell anyone, and that Defendants wanted to "keep this in-house". Ms. Morningstar was also told "Jerry is old and sick, do you really want to do this to him" as well as "what did you do to make him react to you this way" and "Jerry will be retiring soon, can't you just wait it out?" Additional similar and egregious comments were made during and after said meeting.

57. During the meeting, Chief Zingarelli, while holding the employee handbook, said "this has to go to the City but let's sit on it until Monday. While laughing, Chief Zingarelli called Ms. Morningstar a "bitch" and said "you have to make it hard on me don't you."

58. On March 2, 2015, Ms. Morningstar wrote a letter to Interim Chief Zingarelli, Captain Jeff Wise and Lt. Jeff Moorehead regarding the meeting that occurred on February 27, 2015. In the letter, Ms. Morningstar made it clear she did not want to work with Jerry Cornwell any longer.

59. As a result of her complaint, Ms. Morningstar was placed on administrative leave for a couple of days while Mr. Cornwell continued to work. After Mr. Cornwell's departure, Ms. Morningstar was allowed to return to work. Subsequently, a memorandum was provided to the employees regarding Mr. Cornwell's departure, and emphasis was placed on the extra workload this would cause the Chief and instructions on how to forward calls to voice mail since Mr. Cornwell would not be there to answer phones.

60. On June 18, 2015, Ms. Morningstar made a complaint to Human Resources Assistant, Valerie Dilley, regarding unfair treatment within the firehouse, which was forwarded to Mayor McIlroy on June 19, 2015.

61. As a response to Ms. Morningstar's complaint, a meeting was held between Ms. Morningstar, Ms. Dilley and Mayor McIlroy on June 19, 2015.

62. At that June 19, 2015 meeting, Ms. Morningstar discussed her willingness to work with Captain Edgington but that Edgington was hesitant to have a woman on the force and is not a fan of females in the fire service. In fact, Ms. Morningstar advised that she could and would work with anyone but, given the history with Captain Edgington and his views on women in fire service, she did not think it was a good idea.

63. Ms. Morningstar advised Mayor McIlory that Chief Zingarelli took her off of shift 1 and placed her on shift 3 based upon personal bias, discrimination, harassment and/or retaliation.

64. Upon information and belief, this change in schedule was based upon discrimination, harassment, and/or retaliation due to her complaint to Human Resources and/or her prior complaints and/or reports regarding the conduct set forth throughout this Complaint.

65. Ms. Morningstar also discussed with Ms. Dilley and Mayor McIlroy that she did not understand how she failed the promotional test for the Lieutenant position. Ms. Dilley confirmed that Captain Edgington created and subsequently graded said promotional test, which, upon information and belief, is contrary to Defendants' course of dealings and/or applicable policies and standards of said Defendants.

66. Upon information and belief, Capt. Edgington informed Ms. Morningstar that she was at a disadvantage with respect to the promotional test, in part, because she was not on his shift, and his course of dealings/behavior toward Plaintiff support said position.

67. Capt. Edgington stated that he had developed the test and the answers to said test were based on his answers.

68. Upon information and belief, Ms. Morningstar believes she was set up for failure with respect to the same. Further, Ms. Morningstar believes that Capt. Edgington informed her of this as a way to get a rise out of her on her first Unit 3 shift, and that she was being set up for failure.

69. Ms. Morningstar also informed the Mayor that Chief Zingarelli told her that Scott Cavanaugh would be promoted to Lieutenant and that she should not bother testing for the underlying promotion. Ms. Morningstar was told this on multiple occasions and sometimes in front of multiple crewmembers and officers as well as in private meetings.

70. Ms. Morningstar informed the Mayor that Chief Zingarelli referred to her as "bitch" on various occasions and that she was referred to as "bitch" more often than by her given name.

71. Ms. Morningstar also expressed that that employees and/or agents of the Defendants, called and/or referred to her as "bitch," "slut," "whore" and "cunt" on various occasions throughout the duration of her relationship with Defendants, and that she was referred to as "bitch," "slut," "whore" and/or "cunt" to and/or in the presence of not only employees and/or agents of the Defendants, but also to and/or in the presence of individuals outside of the scope of her employment. Ms. Morningstar informed the Mayor that said name calling occurs frequently with the Chief Zingarelli, and that he commonly calls her and/or refers to her as "bitch," "slut," "whore" and/or "cunt".

72. In this same meeting, Ms. Morningstar informed Mayor McIlroy that her socks have been cut, that a male ejaculated on her bunk in the Department as semen was discovered on her bed sheets, and that her equipment, including, but not limited to her oxygen mask, had been damaged.

73. Ms. Morningstar informed Mayor McIlroy that the aforementioned conduct has occurred throughout her working relationship with Defendants, and that the same continued to occur as of the date of said meeting.

74. Ms. Morningstar told Mayor McIlroy that someone had cut all of the armpits out of her duty shirts approximately two months prior to said meeting.

75. Subsequently, Mayor McIlroy, on behalf of Defendants, moved Ms. Morningstar to Unit 1 during the investigation into Ms. Morningstar's allegations.

76. On or about June 26, 2015, Defendants commenced an "independent investigation" at which point Interim Chief Zingarelli was placed on administrative leave pending the outcome of the same.

77. Upon information and belief, an attorney employed by the law firm who represents the City of Circleville, was retained to conduct the aforementioned "independent investigation" and that said "independent investigation" included an extensive in-person interview of Ms. Morningstar. Said interview/"quasi-deposition" of Ms. Morningstar was undertaken by the aforementioned attorney

who was employed by that certain law firm that represents the City of Circleville and Ms. Morningstar was questioned for nearly six (6) hours without the assistance of legal counsel.

78. On August 14, 2015, Ms. Morningstar was asked to attend another meeting with Mayor McIlroy regarding the internal investigation.

79. During this meeting, Mayor McIlroy informed Ms. Morningstar that changes were going to be made; however, that Defendants had made the decision to reinstate Chief Zingarelli as Chief of the Circleville Fire Department.

80. Upon information and belief, Mayor McIlroy, on behalf of Defendants, informed City Council members that Ms. Morningstar's allegations were unfounded and/or unsubstantiated.

81. Information was released to the public through a news article in the *Pickaway News Journal, (August 14, 2015)* which discussed the allegations against Chief Zingarelli as unfounded.

82. Subsequent to the conclusion of the aforementioned investigation, Ms. Morningstar has been the victim of harassment, discrimination and retaliatory behavior from fellow firefighters and her supervisors.

83. On September 7, 2015, Ms. Morningstar was on scheduled leave; however, firefighters at Circleville were led to believe that she had done a "no show no call". Although she was on scheduled leave, the failure to convey accurate information and/or the dissemination of false and/or misleading information that she simply did not show up to work has furthered the hostile work environment, and has caused additional retaliation, discrimination, and humiliation by Defendants. Although Plaintiff's supervisors, including, but not limited to Captain Edgington, had access to the applicable software and could readily determine that Ms. Morningstar had appropriately scheduled the day off, Captain Edgington facilitated the misconception and/or disseminated false and/or misleading information to the other firefighters with respect to the same.

84. On September 16, 2015, Ms. Morningstar arrived at work to find that her locker keys were missing and both of her lockers were unlocked.

85. On or about October 11, 2015 Ms. Morningstar's locker keys were returned to the location where she typically keeps said keys.

86. Ms. Morningstar has also been singled out for going over her apparel allowance and was requested to pay the overage back to the Department. Upon information and belief, the policy and/or course of dealings with respect to the same

would dictate that if a firefighter goes over their clothing allowance for a particular year, said overage would be deducted from the following year's allowance. However, the Department has changed protocol for only Ms. Morningstar and demanded repayment of the overage.

87. Ms. Morningstar paid the overage from her own pocket despite the discriminatory and retaliatory action taken against her.

88. On November 17, 2015 a Proposed Agreement was sent to the State Firefighter's Union regarding Ms. Morningstar's clothing allowance overage, again singling out Ms. Morningstar.

89. Prior to this issue with Ms. Morningstar's overage, the Fire Department's ledger reflected that several other male firefighters exceeded their clothing allowance for the year (2015). However, upon information and belief, the Fire Department's ledger has since been changed to reflect no overage for said male firefighters.

90. Recently, Chief Zingarelli began accusing Ms. Morningstar of failing to clock in and/or out for her shift, which would constitute grounds for discipline.

91. Notwithstanding the foregoing accusations of Chief Zingarelli, Captain Rankin has repeatedly refuted such accusations by printing off the clock-in and clock-out sheets that confirm that Ms. Morningstar is in compliance with the underlying policy.

92. Chief Zingarelli has been approaching Captain Rankin so frequently with these accusations of failure to clock in and/or out that Captain Rankin has begun personally witnessing Ms. Morningstar clock in and out.

93. Ms. Morningstar has suffered and/or is still suffering considerable harassment in her role and/or employment as a Firefighter with the City of Circleville and CFD.

## IV. CAUSES OF ACTION

### A. First Claim – Gender Discrimination

94. The preceding paragraphs are incorporated by reference as if fully restated herein.

95. This gender discrimination took the form of disparate treatment of Ms. Morningstar when compared to similarly situated male employees, as well as the form of disparate impact discrimination.

96. The actions of Defendants as alleged herein constitutes discrimination against Ms. Morningstar based upon her sex in violation of R.C. 4112.02(A) and/or applicable federal statutes, if any, with respect to the tenure, terms, conditions, privileges of employment, and other matters directly and/or indirectly related to her employment, by treating her differently than similarly-situated co-workers, and by other means to be determined at trial.

97. The aforementioned conduct of Defendants was done maliciously and/or intentionally or with reckless disregard for the rights of Ms. Morningstar .

98. Defendants' conduct as herein alleged constituted a conscientious disregard for the rights and/or safety of Ms. Morningstar that had a great probability of causing, and did cause, substantial damage to her, thereby rendering Defendants liable for punitive damages.

99. Defendants' discriminatory conduct was motivated by Ms. Morningstar's gender.

100. Defendants' discrimination created and perpetuated a hostile workplace environment of harassment, discrimination, and retaliation that a reasonable person would find to be hostile, intimidating, offensive and abusive.

101. Ms. Morningstar was offended by the harassment, discrimination, and retaliation and, further, perceived the workplace environment created and perpetuated by Defendants to be hostile, intimidating, offensive and abusive.

102. Defendants' creation of a hostile workplace environment of harassment and discrimination altered the conditions of Ms. Morningstar's employment.

103. Defendants' creation of a hostile workplace environment of harassment and discrimination interfered with Ms. Morningstar's work performance.

104. Ms. Morningstar and other employees reported the hostile work environment to her supervisor but no corrective action was taken.

105. As a direct and proximate result of Defendants' discriminatory conduct as alleged herein, Ms. Morningstar has been damaged in an amount exceeding Seventy-Five Thousand Dollars and 00/100ths ($75,000.00).

106. As a further direct and proximate result of Defendants' conduct, Ms. Morningstar has incurred severe economic damages (including, but not limited to loss of income and other benefits), pain and suffering, humiliation, severe emotional distress, and the loss of enjoyment of life for which Ms. Morningstar asserts a claim against Defendants, jointly and severally, pursuant to applicable law and/or as authorized under R.C. 4112.99 in excess of Seventy-Five Thousand Dollars and 00/100ths ($75,000.00), which damages continue to accrue, for any and

all emotional distress, loss of reputation, humiliation, embarrassment, loss of self-esteem, extreme frustration, sums of Back and Front Pay, and Compensatory and Punitive Damages, plus an award of reasonable attorneys' fees.

107. Each and every one of Defendants' discriminatory actions and omissions complained of herein was intentional, motivated by malice and ill will and/or done with reckless disregard of Ms. Morningstar's rights, thereby entitling her to recover punitive damages.

### B. Second Claim – Intentional and/or Negligent Infliction of Emotional Distress

108. The preceding paragraphs are incorporated by reference as if fully restated herein.

109. Defendants owe a duty to Ms. Morningstar to refrain from intentional and/or negligent injury. The wrongful conduct of Defendants, as alleged herein, has resulted in and/or has continued to result in the intentional and/or negligent infliction of emotional distress to Ms. Morningstar for which Defendants are jointly and severally liable.

110. Defendants have breached their duty to Ms. Morningstar based on their conduct, actions, and/or inactions as alleged herein, and Defendants intentionally and proximately caused injury to Ms. Morningstar in the form of embarrassment, mental anguish, loss of reputation, loss of self-esteem, and harm to Ms. Morningstar's relationship with her family, and other emotional distress resulting in physical injury in form of adverse health effects. Said injuries caused extreme pain and suffering in the past and will likely continue to cause pain and suffering in the future.

111. Defendants' conduct as alleged herein was and/or is outrageous and has proximately caused damage to Ms. Morningstar arising from the intentional infliction of serious emotional distress upon her for which Ms. Morningstar is entitled to judgment and recovery under Ohio law against Defendants, jointly and severally.

112. Defendants' conduct as described herein was willful, malicious, spiteful, with ill will, and/or a reckless disregard for Ms. Morningstar's legal rights.

113. As a direct and proximate result of Defendants' conduct, Ms. Morningstar has been damaged in an amount in excess of Seventy-Five Thousand Dollars and 00/100ths ($75,000.00).

### C. Third Claim – Retaliation

114. The preceding paragraphs are incorporated by reference as if fully restated herein.

115. Ms. Morningstar engaged in protected activity, by reporting the hostile work environment and discrimination by Defendants, and by providing requested information regarding her supervisor.

116. Due to Ms. Morningstar's engagement in said protected activity, Ms. Morningstar has been subjected to continuous and harmful unlawful conduct, including but not limited to, being treated with contempt, being subjected to on-going scrutiny by her supervisor, failure to promote, damage to her reputation, the destruction of personal and work property, and discovering bodily secretions on her personal property, including but not limited to discovering urine in her shampoo bottle and semen and/or some other bodily fluids on her bunk sheets. Further, Ms. Morningstar also sets forth that employees and/or agents of the Defendants, called and/or referred to her as "bitch," "slut," "whore" and "cunt" on various occasions throughout the duration of her relationship with Defendants, and that she was referred to as "bitch," "slut," "whore" and/or "cunt" to and/or in the presence of not only employees and/or agents of the Defendants, but also to and/or in the presence of individuals outside of the scope of employment if Defendants. Finally, Ms. Morningstar sets forth that Chief Zingarelli commonly calls Ms. Morningstar and/or refers to her as "bitch," "slut," "whore" and/or "cunt".

117. As a result, of Defendants' wrongful conduct, the Ms. Morningstar has suffered damages, and will likely continue to suffer severe economic, psychological, physical and emotional distress and is entitled to judgment as a matter of law pursuant to R.C. § 4112, et seq.

118. Defendants' conduct shows a conscious disregard for the rights and/or safety of Plaintiff, and had and/or has a great probability of causing, and did cause, substantial damages to Ms. Morningstar, thereby rendering Defendants liable for punitive damages.

119. As a direct and proximate result of Defendants' conduct, Ms. Morningstar has been damaged in an amount in excess of Seventy-Five Thousand Dollars and 00/100ths ($75,000.00).

**D. Fourth Claim – Equal Pay Violations**

120. The preceding paragraphs are incorporated by reference as if fully restated herein.

121. As set forth throughout this Complaint, Defendants discriminated against Plaintiff, in violation of the Equal Pay Act.

122. As a direct and proximate result of the Defendants acts and omissions, including, but not limited to those acts or omissions with respect to the promotional

test, Ms. Morningstar was paid less than similarly situated male employees at CFD, which caused her to lose income and benefits.

123. As a direct and proximate result of Defendants' conduct, Ms. Morningstar has been damaged in an amount in excess of Seventy-Five Thousand Dollars and 00/100ths ($75,000.00), which damages continue to accrue, for any and all emotional distress, loss of reputation, humiliation, embarrassment, loss of self-esteem, extreme frustration, sums of Back and Front Pay, and Compensatory and Punitive Damages, plus an award of reasonable attorneys' fees.

124. Each and every one of Defendants' discriminatory actions and omissions complained of herein was intentional, motivated by malice and ill will and/or done with reckless disregard of Ms. Morningstar's rights, thereby entitling her to recover punitive damages.

### E. Fifth Claim – Ohio Public Policy Tort

125. The preceding paragraphs are incorporated by reference as if fully restated herein.

126. Defendants actions against Ms. Morningstar are retaliatory, motivated in part by Ms. Morningstar's gender, and her complaints of sexual harassment and discrimination. Further, Ms. Morningstar has essentially been constructively discharged from her employment and/or discriminated against as a result of being regarded as disabled.

127. There exists a clear public policy manifested in the Ohio Revised Case, including, but not limited to, R. C. Chapter 4112 prohibiting discrimination on the basis of gender, including sexual harassment, and prohibiting retaliation for complaining of discrimination and reporting harassment and discrimination.

128. Defendants' actions, inactions, and/or retaliatory actions jeopardize one or all of the clear public policies described in the preceding paragraph and, further, were motivated by a desire to abrogate one or all of these clear public policies.

129. Ms. Morningstar is entitled to recover against Defendants in tort as provided by the Ohio Supreme Court in *Kulch v. Structural Fibers* (1997), 78 Ohio St. 3d 134.

130. Defendants lack an overriding legitimate business justification for its treatment of Ms. Morningstar.

131. As direct and proximate result of Defendants' tortuous actions, Ms. Morningstar has been embarrassed and humiliated, and Ms. Morningstar has and continues to suffer loss of substantial earnings.

132. Defendants' actions were in reckless disregard of Ms. Morningstar's rights and/or motivated by malice and ill will, thereby entitling Ms. Morningstar to recover punitive damages.

### F. Sixth Claim – Hostile Work Environment

133. The preceding paragraphs are incorporated by reference as if fully restated herein.

134. As set forth *supra,* pursuant to federal law, Ms. Morningstar belongs to a protected group as a female (gender).

135. As set forth more fully above, Ms. Morningstar has been subjected to retaliation, discrimination, and unwelcome sexual harassment, including but not limited to, sexual advances and/or requests for sexual favors, and other conduct of a sexual nature.

136. Upon information and belief, the retaliation, discrimination, and harassment was based on Plaintiff's sex.

137. As set forth more fully above, Defendants' unwelcome, harassing, retaliatory and/or discriminatory conduct was severe and/or pervasive and created, and continues to create, a hostile, offensive work environment for Ms. Morningstar based on Ms. Morningstar's gender (female) and/or unreasonably interfered with her employment.

138. As set forth more fully above, Defendants' ratified the conduct of its employees, agents and/or authorized representatives.

139. By reason of the foregoing acts and omissions of Defendants, Ms. Morningstar has suffered damages in an amount exceeding Seventy-Five Thousand Dollars and 00/100ths ($75,000.00), which damages continue to accrue for any and all emotional distress, loss of reputation, humiliation, embarrassment, loss of self-esteem, extreme frustration, sums of Back and Front Pay, and Compensatory and Punitive Damages, plus an award of reasonable attorneys' fees

### G. Seventh Claim – Sexual Harassment

140. The preceding paragraphs are incorporated by reference as if fully restated herein.

141. As set forth *supra,* Ms. Morningstar belongs to a protected class.

142. As set forth more fully above, Ms. Morningstar has been subjected to unwelcome sexual harassment and Defendants have caused, ratified, and/or facilitated said behavior.

143. Upon information and belief, the harassment was based on her sex.

144. As set forth more fully above, Defendants' ratified the conduct of its employees, agents and/or authorized representatives.

145. Defendants' conduct violates R.C. Chapter 4112.

146. Ms. Morningstar notified Defendants of the sexual harassment.

147. As a result of the aforementioned harassment, Defendants created a hostile work environment and Plaintiff's work performance was unreasonably interfered with.

148. As set forth more fully above, Defendants knew of the charged sexual harassment.

149. Chief Zingarelli furthered the hostile work environment for Ms. Morningstar by moving her to 3 Unit.

150. Defendants failed to implement prompt and appropriate corrective action; despite their knowledge, actual or constructive, of the charged sexual harassment.

151. By reason of the foregoing acts and omissions of Defendants, Ms. Morningstar has suffered damages in an amount exceeding Seventy-Five Thousand Dollars and 00/100ths ($75,000.00), which damages continue to accrue for any and all emotional distress, loss of reputation, humiliation, embarrassment, loss of self-esteem, extreme frustration, sums of Back and Front Pay, and Compensatory and Punitive Damages, plus reasonable attorneys' fees.

## H. Eighth Claim – Temporary Restraining Order / Preliminary Injunction

152. The preceding paragraphs are incorporated by reference as if fully restated herein.

153. Upon information and belief, Plaintiff has reasonable cause to believe that, unless and until enjoined and restrained by Order of this Court Defendants will continue to irreparably harm Plaintiff by continually engaging in those certain acts which are set forth more fully throughout this Complaint.

154. Defendants' actions have been committed intentionally, willfully and/or with reckless disregard.

155. If Defendants are not enjoined, Plaintiff will suffer irreparable harm. Further, Plaintiff has no adequate remedy at law with respect to the same.

156. For the forgoing reasons, a temporary restraining order and preliminary injunction are necessary to preserve the status quo pending the resolution of the instant litigation.

**WHEREFORE**, Plaintiff prays for judgment against Defendants, jointly and severally, as follows:

1. For actual, compensatory and consequential damages in excess of Seventy-Five Thousand Dollars and 00/100 ($75,000.00);

2. For punitive damages as a result of the wrongful acts complained of herein in excess of Seventy-Five Thousand Dollars and 00/100 ($75,000.00);

3. That this Court issue an Order restraining and enjoining Defendants from continuing their unlawful employment practices;

4. For reasonable attorney's fees in an amount to be determined; and

5. For costs and other such relief, in law or equity, as this Court deems just and proper, including but not limited to pre-judgment and post judgment interest.

## JURY DEMAND

Ms. Morningstar hereby demands a jury trial for all issues contained in this Complaint.

Respectfully submitted,

/s/ Brian K. Duncan
Brian K. Duncan, Esq. (0080751)
119 East Granville Street
Sunbury, Ohio 43074
Phone: (740) 965-1347
Fax:    (614) 386-0410
Email: bduncanlegal@gmail.com
*Attorney for Plaintiff*

/s/ Gregory P. Barwell
**WESP BARWELL, L.L.C.**
Gregory P. Barwell (0070545)
Quinn M. Schmiege (0085638)
Attorneys at Law
100 E. Broad Street, Suite 2350
Columbus, Ohio 43215
P+F: (614) 456-0488
Email: gbarwell@wesplaw.com
Email: qschmiege@wesplaw.com
*Attorneys for Plaintiff*

STATE OF OHIO:
COUNTY OF FRANKLIN:	SS:

Amie L. Morningstar, being first duly cautioned and sworn, deposes and states that she has read the foregoing Verified Complaint; that she has personal knowledge of the facts and allegations contained therein; and that the facts stated and the allegations contained therein are true and accurate to the best of her knowledge.

_____
Amie L. Morningstar

Sworn to before me and subscribed in my presence by the above-named individual, Amie L. Morningstar on this 12-8th _____ day of December, 2015.

QUINN SCHMIEGE NYHAN
ATTORNEY AT LAW
MY COMMISSION
DOES NOT EXPIRE
Section 147.03 R.C.

_____
Notary Public