**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **AMIE L. MORNINGSTAR,** | : | |
| | : | **Case No. 2:15-cv-3077** |
| **Plaintiff,** | : | |
| | : | **JUDGE ALGENON L. MARBLEY** |
| **v.** | : | |
| | : | **Magistrate Judge Deavers** |
| **CIRCLEVILLE FIRE & EMS** | : | |
| **DEPARTMENT,** *et al.*, | : | |
| | : | |
| **Defendants.** | : | |

## OPINION AND ORDER

This matter is before the Court on the Motion for Summary Judgment (ECF No. 17) of Defendants Circleville Fire Department & EMS Department ("CFD"), City of Circleville (the "City") (collectively the "Circleville Defendants") and Marc Zingarelli. For the reasons set forth below, Defendants' Motion is **GRANTED IN PART** and **DENIED IN PART**.

## I.     BACKGROUND

### A.     Factual Background

Plaintiff, Amie Morningstar, was the first female firefighter ever to work at CFD. (ECF No. 24 at 5). In 2001, Ms. Morningstar began volunteering for Circleville Emergency Medical Services ("CMS"), which merged with the Circleville Fire Department ("FD") in 2003 or 2004. (ECF No. 16-7 at 15; ECF No. 16-3 at 43-44). She attended fire school and obtained her professional fire certification in 2003. (ECF No. 16-7 at 11-12). While CMS and FD were merging, Ms. Morningstar applied to volunteer for FD. (ECF. No. 16-7 at 35). Her volunteer applicant group was the first group required to pass a physical test in order to volunteer. (ECF No. 16-6 at 45). Ms. Morningstar passed the physical test and became a volunteer firefighter but did not receive firefighter equipment or gear. (ECF No. 16-7 at 101). Because she did not

receive the required gear, she was not able to participate in active fire runs like the male volunteers and instead had to stay at the fire station. (ECF 16-7 at 101; ECF No. 16-1 at 83-4). Ms. Morningstar asked her commanding officer multiple times for her gear but to no avail. (ECF No. 16-7 at 100-01). Ms. Morningstar's custom gear took four years to arrive—significantly longer than the typical two to six months that it took for other firefighters' gear to arrive. (ECF No. 16-3 at 82, 84). Indeed, she only received her equipment and gear when she became a full-time firefighter in 2007. (ECF No. 16-7 at 191).

Ms. Morningstar first applied to become a full-time firefighter and medic with CFD in 2005, but was not hired. (ECF No. 16-7 at 108-10). CFD instead hired a male with no fire or EMS certifications. (*Id.*). Ms. Morningstar again applied to become a full-time CFD employee in 2007. (*Id.* at 114). In connection with her application, Ms. Morningstar was required to take an agility test. In 2007—the year she took the test—the test was changed to become more difficult: applicants were required to drag a two and one-half inch charged line as compared to the previous test utilizing an inch and three quarter or inch and a half charged line. (ECF No. 16-1 at 69-70). At least one firefighter spoke to Chief Tener about the changes made to the agility test, and specifically objected because "it did not look good" to make the changes when "a first ever female candidate [came] through." (*Id.* at 70). Testimony indicates that in practice, no one actually drags a two and a half inch line alone—instead, two people usually do it because "it's a bear to do." (*Id.*). When Ms. Morningstar passed the agility test, Captain Edgington, who conducted her test, stated: "It looks like it's time to make this test harder." (ECF No. 16-7 at 113; ECF No.16-2. at 86). Additionally, Captain Edgington wrote in a report: "Unfortunately it is time to allow a female into the department"—a fact of which Mayor McIlroy was aware.

2

(ECF No. 16-2 at 69-70).  Another firefighter testified that Captain Edgington didn't "care[] for women in the fire service."  (ECF No. 16-1 at 67).

After passing the agility test, Ms. Morningstar was finally hired as a full-time firefighter. Instead of beginning her job, however, Ms. Morningstar was placed on a 90-day "on-the-job-training" probationary period—becoming the only new firefighter in CFD history who was required to do so.  (ECF No. 16-7 at 118; ECF No. 16-8 at 34).  The male firefighters were only required to go through a 30-day probationary period.  (*Id.*).  Once she began the job, Ms. Morningstar's equipment and gear were tampered with or showed up missing on numerous occasions, and other "pranks" were played on her.  For example, in 2007, her gloves, Nomex hoods, and her radio disappeared.  (ECF No. 16-7 at 124, 127).  On September 28, 2011, her safety mask was tampered with.  (*Id.* at 124, 127, 135).  In July of 2012, she found her bed comforter stained with a semen-like substance.  (*Id.* at 139).  In August of 2012, her socks were taken from her locker and destroyed.  (*Id.* at 146).  Other incidents include repeatedly cutting or tearing the armpits of her shirts and urinating in her shampoo bottle.  (*Id.* at 145-46, 137-37). One male firefighter also had his shampoo bottle urinated in.  (ECF No. 16-6 at 86-87).  Other firefighters were aware of the pranks.  (ECF No. 16-1 at 92, 97).  Mayor McIlroy was aware of the above actions and spoke to Chief Tener to tell him not to let it happen again.  (ECF No. 16-2 at 81).  In response to Ms. Morningstar's complaints of equipment tampering, Chief Tener issued a memorandum advising firefighters that they would be terminated immediately if they tampered with anyone's equipment.  (ECF No. 16-7 at 131).  Ms. Morningstar testified, however, that these incidents continued throughout her entire career at CFD.  (ECF No. 16-7 at 138).

During her career at CFD, an opening for a Lieutenant position arose.  Testing for the promotion occurred in the spring of 2015.  (ECF No. 16-7 at 152).  Defendant Chief Zingarelli

told Ms. Morningstar on multiple occasions not to bother testing, as there would be no point since she would not pass. (*Id.*). Chief Zingarelli told her that Firefighter Scott Cavanaugh would get the promotion, and he ultimately did. (ECF No. 16-4 at 40). While Ms. Morningstar was waiting for her turn to take the oral test for the promotion, Chief Zingarelli called her a "bitch" in front of the agency administering the test. (ECF No. 16-7 at 161). Ms. Morningstar did not pass the test and was not selected for the promotion. (ECF No. 16-7 at 81). A male firefighter also failed and was not selected. (ECF No 16-7 at 156-57).

Additionally, Ms. Morningstar experienced unwanted sexual advances by Jerry Cornwell, an employee of the City, from 2014 to 2015. (ECF No. 16-7 at 167). In August of 2014, Mr. Cornwell pulled Ms. Morningstar toward him, forced an embrace, and attempted to kiss her in the front office of CFD. (ECF No. 16-2 at Ex. 8; ECF No. 1 at ¶ 51-52). Ms. Morningstar reported the incident to Lieutenant Rankin, who authored a report regarding the incident that states "I do know that this is not the first time similar events have occurred between Firefighter Morningstar and Jerry Cornwell but this is the first time that Firefighter Morningstar has expressed any concerns." (*Id.*). Ms. Morningstar stated at that time that she did not want to file a formal complaint. (ECF No. 16-8 at 56-57). At the 2014 pumpkin festival, City Councilwoman Tammy Bowers informed Mayor McIlroy of the sexual harassment Ms. Morningstar experienced at the hands of Mr. Cornwell. (ECF No. 22-1 at 33-36). Defendants allege that the mayor instructed the City's Human Resources assistant to follow up with Ms. Morningstar regarding the incident, but Ms. Morningstar did not respond to the emails. (ECF No. 16-5 at 21). Councilwoman Bowers also spoke to Chief Tener about the sexual harassment Ms. Morningstar experienced, and he stated he would take care of it. (ECF No. 22-1 at 35-36).

Nothing was done about the harassment, however, and in February of 2015 Ms. Morningstar again experienced an unwanted encounter with Mr. Cornwell—he grabbed her by the waist and put his head into her chest. (ECF No. 16-2 at Ex. 11). Ms. Morningstar reported the incident to her supervisor, Mr. Rankin. (*Id.*). Ms. Morningstar then had a meeting with Captain Wise, Lieutenant Moorehead, and Chief Zingarelli to discuss her allegations. (*Id.*). Ms. Morningstar alleges that she was told not to tell anyone about the incident, as they wanted to keep it in house. (*Id.*). Defendants counter that Ms. Morningstar expressed reservations about filing a formal complaint with HR. (ECF No. 16-1 at 101). During the meeting, Chief Zingarelli called Ms. Morningstar a "bitch". (ECF No. 16-7 at 178). After the meeting, Ms. Morningstar was placed on administrative leave, while Mr. Cornwell continued to work. (ECF No. 16-1 at 117-18). The Monday after the meeting, Ms. Morningstar drafted a letter to Chief Zingarelli that also went to the mayor, stating that she wanted to file a formal complaint, she did not want to work with Mr. Cornwell, and that she was taking a few days off. (ECF No. 16-8 at Ex. 12). Mr. Cornwell ultimately pled guilty for his actions. (ECF No. 16-2 at 56). The day after the letter was sent, Mr. Cornwell was terminated. (*Id.* at 55). Ms. Morningstar returned to work, and a memorandum was sent around regarding Mr. Cornwell's departure, emphasizing the extra work load his departure would cause. (ECF No. 16-1 at 122-23).

Ms. Morningstar further testified that Chief Zingarelli called her a "fucking bitch" on at least three occasions, including the two mentioned above, as well as a "cunt." (ECF No. 16-7 at 60, 161, 178; ECF No. 22-2 at 23-25). She was also referred to as a "whore" and a "slut." (ECF No. 16-2 at 14, 61, 71). Ms. Morningstar made a complaint to the City about Chief Zingarelli's behavior and all of the unfair treatment she experienced at CFD. (ECF No. 16-2 at 74). In response to her complaint, a meeting was held between Ms. Morningstar, a human resources

assistant, and Mayor McIlroy on June 19, 2015. (ECF No. 16-2 at 13). At the meeting, Ms. Morningstar detailed the incidents described above, including that her socks had been cut, that a male ejaculated on her bunk, that her equipment had been damaged, and that she was frequently referred to as a "bitch," "slut," "whore" and "cunt". (*Id.* at 14, 61, 71). She explained that she did not understand how she failed the promotional test for the lieutenant position and she believed Captain Edgington created and graded the test, contrary to Defendants' applicable policies—a fact Defendants dispute. (ECF No. 16-7 at 155-56, 161; ECF 16-3 at 18, 54). She stated that Captain Edgington told her that she was at a disadvantage with respect to the promotional test because she was not on his shift. (ECF No. 16-7 at 155-56). Ms. Morningstar also stated at the meeting that she believed Chief Zingarelli took her off of shift 1 and placed her on shift 3 due to personal bias, discrimination, and/or retaliation. (ECF No. 16-7 at 55; ECF No. 16-2 at 73).

After the meeting, the City retained its law firm to conduct an internal investigation. (ECF No. 16-2 at 71-72). During the investigation, Ms. Morningstar was moved to Unit 1. (ECF No. 16-4 at 112). Chief Zingarelli was placed on administrative leave during the pendency of the investigation. (*Id.* at ¶ 76). The investigator ultimately found that the evidence did not establish that Chief Zingarelli violated the City's discrimination, harassment, or retaliation policy and he was thus re-instated. (ECF No. 16-4 at 110; ECF No. 24-6).

After the investigation, Ms. Morningstar alleges additional incidents occurred. In September of 2015, she found her locker keys missing and her locker unlocked. (ECF No. 16-7 at 218). Additionally, Ms. Morningstar had to pay out of pocket for going over her apparel allowance, despite what she believes is the traditional policy that the overage be deducted from the following year's allowance. (ECF No.16-7 at 198; 204-08). Defendants contend male

employees, including Chief Zingarelli, were subject to the same policy. (ECF No. 16-4 at 117). Further, Chief Zingarelli began accusing her of failing to clock in and out properly—which is grounds for discipline—despite Captain Rankin repeatedly refuting such allegations by printing off the clock-in and clock-out sheets to confirm she is in compliance. (ECF No. 16-7 at 198; ECF No. 16-4 at 21-22). Finally, Ms. Morningstar believed she was being ignored by other firefighters. (ECF No. 16-7 at 201).

After Ms. Morningstar filed the instant lawsuit, she went on paid administrative leave. (ECF No. 16-7 at 241). After the leave expired, Ms. Morningstar did not return to work, and the City sent her a letter terminating her employment for failing to show up to work without calling in for five shifts, deeming her to have quit without notice. (*Id.* at 245; ECF No. 17 at Ex. D).

## B.     Procedural Background

Ms. Morningstar initiated this lawsuit on December 11, 2015. (ECF No. 1). In her complaint, Ms. Morningstar alleges the following causes of action: (1) gender discrimination; (2) intentional and/or negligent infliction of emotional distress; (3) retaliation; (4) violations of the Equal Pay Act; (5) violations of Ohio Public Policy Tort; (6) hostile work environment; and (7) sexual harassment.[1] The discrimination and harassment claims are brought both under federal law and state law. On April 19, 2017, Defendants filed the instant Motion for Summary Judgment. This Court held an oral argument on the Motion on February 12, 2018. (*See* ECF No. 29). After oral argument, the Court ordered additional briefing on the issue of exhaustion under Title VII. (ECF No. 31). The Motion is now fully briefed and ripe for decision.

---

[1] Additionally, Ms. Morningstar's complaint requested a temporary restraining order and/or preliminary injunction. Because Ms. Morningstar no longer works for CFD (ECF No. 16-7 at 245), this request is moot.

## II.    STANDARD OF REVIEW

Federal Rule of Civil Procedure 56(a) provides, in relevant part, that summary judgment is appropriate "if the movant shows that there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law." A fact is deemed material only if it "might affect the outcome of the lawsuit under the governing substantive law." *Wiley v. United States,* 20 F.3d 222, 224 (6th Cir. 1994) (citing *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986)). The nonmoving party must then present "significant probative evidence" to show that "there is [more than] some metaphysical doubt as to the material facts." *Moore v. Philip Morris Cos., Inc.,* 8 F.3d 335, 340 (6th Cir. 1993). The mere possibility of a factual dispute is insufficient to defeat a motion for summary judgment. *See Mitchell v. Toledo Hospital,* 964 F.2d 577, 582 (6th Cir. 1992). Summary judgment is inappropriate, however, "if the dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248.

The necessary inquiry for this Court is "whether 'the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.'" *Patton v. Bearden,* 8 F.3d 343, 346 (6th Cir. 1993) (quoting *Anderson,* 477 U.S. at 251-52). In evaluating such a motion, the evidence must be viewed in the light most favorable to the nonmoving party. *United States S.E.C. v. Sierra Brokerage Servs., Inc.*, 712 F.3d 321, 327 (6th Cir. 2013). The mere existence of a scintilla of evidence in support of the opposing party's position will be insufficient to survive the motion; there must be evidence on which the jury could reasonably find for the opposing party. *See Anderson,* 477 U.S. at 251; *Copeland v. Machulis,* 57 F.3d 476, 479 (6th Cir. 1995).

## III.     ANALYSIS

### A.     Equal Pay Act Claim

Defendants argues in their Motion for Summary Judgment that Ms. Morningstar cannot prevail under her Equal Pay Act claim because there is no evidence that she was paid different wages than male employees—only that she did not receive a promotion.  (ECF No. 17 at 8-9). Defendants further argue that Plaintiff abandoned her EPA claim because she did not mention it in her Response in Opposition to Defendants' Motion for Summary Judgment.  (ECF No. 27 at 3).  Though Ms. Morningstar did not discuss her EPA claim in her initial briefing, she did so both at oral argument and in her supplemental briefing.  *See* Transcript of February 12, 2018 Hearing ("Transcript"); ECF No. 33 at 6-7.  Defendants thus had an opportunity to address her EPA arguments both through oral advocacy and in its supplemental briefing.  In these circumstances, the Court will not hold the errors of the attorney against the client and deem the claim abandoned.

On the merits, however, Ms. Morningstar cannot prevail.  The Equal Pay Act provides that an employer shall not discriminate "between employees on the basis of sex . . . for equal work on jobs the performance of which requires equal skill, effort, and responsibility, and which are performed under similar working conditions."  29 U.S.C. § 206(d)(1).  In order to state a prima facie claim under the Equal Pay Act, an employee "must show that an employer pays different wages to employees of opposite sexes for equal work on jobs the performance of which requires equal skill, effort, and responsibility, and which are performed under similar working conditions."  *Beck-Wilson v. Principi*, 441 F.3d 353, 359 (6th Cir. 2006) (internal quotations omitted).

Ms. Morningstar has pointed to no evidence in the record that shows how much she gets paid, let alone how much her male counterparts in "nearly identical" circumstances get paid.  *See*

*Patterson v. Best Buy Co.*, No. 1:13-CV-49, 2015 WL 248018, at *7 (S.D. Ohio Jan. 20, 2015) ("[A] plaintiff must show that his circumstances are nearly identical to those of a better-paid employee who is not a member of the protected class.") (internal quotations omitted). Her failure to argue at any point that she makes less than a member of a non-protected class—and substantiate the argument with evidence of salary and comparable jobs—is fatal to her claim. *See Cotuna v. Wal-Mart Stores, Inc.*, No. 16-2519, 2017 WL 5171247, at *1, *3 (6th Cir. Aug. 31, 2017) (denying plaintiff's claim that employer "refus[ed] to grant him a promotion in violation of the EPA" when plaintiff "did not show that female colleagues received different pay for the same work as male colleagues"); *see also Schnellbaecher v. Baskin Clothing Co.*, 887 F.2d 124, 130 (7th Cir. 1989) ("discrimination . . . in promotion . . . is beyond the scope of the Equal Pay Act"); *Int'l Union of Elec., Radio & Mach. Workers, AFL-CIO-CLC v. Westinghouse Elec. Corp.*, 631 F.2d 1094, 1103 (3d Cir. 1980) ("Title VII proscribes a broad range of gender-based discrimination which is not barred by the Equal Pay Act, such as discriminatory promotions"). She has thus not met her burden and summary judgment in favor of Defendants on **Count IV** is **GRANTED**.

**B. Exhaustion of Federal Discrimination and Harassment Claims**

Before an employee can bring federal discrimination and harassment claims under Title VII, she "must file a charge with the EEOC and receive a right-to-sue letter." *Waggoner v. Carlex Glass Am., LLC*, 682 F. App'x 412, 416 (6th Cir. 2017). An employee is "required to exhaust her administrative remedies." *Randolph v. Ohio Dep't of Youth Servs.*, 453 F.3d 724, 731–32 (6th Cir. 2006). The exhaustion requirement is meant to "trigger an investigation, which gives notice to the employer of alleged wrongdoing." *Crowder v. Railcrew Xpress*, 557 F. App'x 487, 491 (6th Cir. 2014).

Here, Defendants argue that Ms. Morningstar's federal discrimination and harassment claims should be dismissed for failure to exhaust administrative remedies. (ECF No. 17 at 8). Ms. Morningstar did not address the exhaustion argument in her Response to Defendants' Motion for Summary Judgment, but she made three arguments at the hearing as to why her federal discrimination claims should not be dismissed for failure to exhaust, which were later briefed by both parties. (ECF Nos. 31-35). First, she argued that she need not exhaust her administrative remedies because exhaustion is not required when a plaintiff also brings a claim under the Equal Pay Act. *See* Transcript. Second, she argued that she need not exhaust her administrative remedies because exhaustion is not required when a plaintiff seeks a temporary restraining order or a preliminary injunction. *Id.* Finally, she argued that exhaustion was excused because Defendants had notice of her claims. *Id.*

In regards to her first argument, Defendants correctly point out that Ms. Morningstar is conflating the issue of whether the EPA has an administrative exhaustion requirement with the issue of whether, if an EPA claim is also brought, a plaintiff must file a charge with the EEOC and obtain a right to sue letter in order to proceed with her Title VII claims. Ms. Morningstar cites to *Bevins v. Dollar Gen Corp.*, 952 F. Supp. 504 (E.D. Ky. 1997) for the proposition that the "Equal Pay Act, unlike Title VII, has no requirement of filing administrative complaints and awaiting administrative conciliation efforts." 952 F. Supp. at 508; ECF No. 33 at 6. While that statement is undoubtedly true, it does not follow that just because there is no exhaustion requirement under EPA, the filing of an EPA claim somehow excuses the exhaustion requirement of Title VII such that Plaintiff's Title VII claims can proceed, despite failure to exhaust. Indeed, in *Bevins* itself, the court allowed the EPA claims to proceed, but dismissed the Title VII claims for failure to exhaust. 952 F. Supp. at 511; *see also Biggs v. N. Cent. United*

*Tel. Co.*, No. C-2-95-913, 1997 WL 829173, at *6 (S.D. Ohio Oct. 15, 1997) (dismissing Title VII claims for failure to exhaust but allowing EPA claims to proceed). Ms. Morningstar cites to no case finding that exhaustion is excused under Title VII when an EPA claim is pled. This Court will not so hold.

As to the second argument, Ms. Morningstar fails to point the Court to any authority finding that the request for a temporary restraining order ("TRO") or preliminary injunction ("PI") obviates the need to exhaust under Title VII. Her entire argument references only Ohio Revised Code Section 4112, and appears to argue that her claim for TRO/PI was permitted under the state law. *See* ECF No. 33 at 23 ("Plaintiff's Claim for TRO/PI was properly pled and is expressly permitted by and through ORC 4112"). She does not explain how a TRO/PI eliminates the need to exhaust under Title VII. Defendants correctly point out that courts have dismissed Title VII claims for failure to exhaust, even when plaintiffs sought injunctive relief. *See* ECF No. 32 at 4 (citing *Coleman-Adebayo v. Leavitt*, 326 F. Supp.2d 132 (D.D.C. 2004)). Thus, Ms. Morningstar's claim for a TRO/PI will not save her Title VII claims.

Additionally, Ms. Morningstar argues that exhausting her administrative remedies was not necessary, as all of the Defendants were on notice of her claims as a result of the City's investigation. (ECF No. 33 at 29). This Court agrees. The Supreme Court has held that "filing a timely charge of discrimination with the EEOC is not a jurisdictional prerequisite to suit in federal court, but a requirement that, like a statute of limitations, is subject to waiver, estoppel, and equitable tolling." *Zipes v. Trans World Airlines, Inc.,* 455 U.S. 385, 393 (1982). In other words, Ms. Morningstar's exhaustion requirements are subject to equitable defenses, including estoppel. *See Fowlkes v. Ironworkers Local 40*, 790 F.3d 378, 384 (2d Cir. 2015) ("The weight of precedent demonstrates that administrative exhaustion is not a *jurisdictional* requirement;

rather, it is merely a precondition of suit and, accordingly, it is subject to equitable defenses.")
(emphasis is original). Estoppel "is an equitable doctrine invoked to avoid injustice in particular
cases." *Heckler v. Cmty. Health Servs. of Crawford Cty., Inc.*, 467 U.S. 51, 59 (1984). To
invoke the doctrine, two elements must be shown: (1) reasonable reliance; and (2) detriment. *In
re McKenzie*, 225 B.R. 377, 380 (N.D. Ohio 1998). The "hallmark of the doctrine is its flexible
application." *Heckler*, 467 U.S. at 59.

Here, Defendants are estopped from arguing that Ms. Morningstar should have exhausted
her claims because they were already on notice of all of her allegations, and if exhaustion were
required under these circumstances, an injustice would result. Ms. Morningstar filed a formal
complaint with the City. The City then undertook an investigation, culminating in a report that
addresses her disparate treatment, harassment, and retaliation claims. (ECF No. 24-5). The City
investigator met with Ms. Morningstar and Chief Zingarelli, as well as ten other witnesses—
many of who were deposed in this matter—to investigate the claims at issue here. Ms.
Morningstar reasonably relied on the internal investigation to put Defendants on notice, and
Defendants now arguing that she must undertake additional steps before brining suit in federal
court is undoubtedly to her detriment. Given Defendants' detailed notice, they are now estopped
from arguing that she must exhaust under Title VII.

Moreover, courts should interpret "[s]uit thresholds . . . with sensitivity to Title VII's
remedial aims." *Loe v. Heckler,* 768 F.2d 409, 417 (D.C. Cir. 1985). The statute was "devised
as a measure that would be kept accessible to individuals untrained in negotiating procedural
labyrinths." *Id.*; *see also Zipes*, 455 U.S. at 397 (reasoning that Title VII's timing requirement
was not jurisdictional in part because a "technical reading would be particularly inappropriate in
a statutory scheme in which laymen, unassisted by trained lawyers, initiate the process.")

13

(internal quotations omitted). The purpose of Title VII—to give notice to the employer—was clearly met here. It cannot be said that the Defendants were not on notice of Ms. Morningstar's claims or without opportunity to resolve them before litigation; the City's pre-suit investigation bespeaks the City's being on notice. The Court holds that Ms. Morningstar's federal discrimination claims can proceed. In so holding, the Court "honor[s] the remedial purpose of the legislation as a whole without negating the particular purpose of the filing requirement, to give prompt notice to the employer." *Zipes*, 455 U.S. at 398; *see also Martinez v. Orr*, 738 F.2d 1107, 1109 (10th Cir. 1984) (finding "equitable considerations require that [Plaintiff] be allowed to proceed with his claims.").

Finally, Defendants argue that there is no futility exception to Title VII's exhaustion requirement, and indeed, that there are no exceptions at all to the exhaustion requirement. (ECF No. 32 at 2-3). In light of *Zipes*, *supra*, however, Defendants err in their argument that the exhaustion requirement is subject to no exception. It is true, as Defendants contend, that some courts have held that there is no futility exception to Title VII's exhaustion requirement. *See Murphy v. West*, 945 F. Supp. 874, 876–77 (D. Md. 1996) (declining to adopt futility exception when plaintiffs "cited no case authority for their extraordinary proposition, and [the judge's] own research [did] not locate any substantial support for the creation of a 'futility' exception to the Title VII exhaustion requirement"). Other courts, however, have recognized such an exception. *See Harris v. Attorney Gen. of U.S.*, 657 F. Supp. 2d 1, 13 (D.D.C. 2009) ("Exhaustion of administrative remedies is not required where exhaustion would be futile."); *Fowlkes*, 790 F.3d at 386 ("When an agency has previously taken a firm stand against a plaintiff's position, the plaintiff's failure to exhaust administrative remedies may be excused on the ground that exhaustion would be futile.") (internal quotations omitted). In any event, the

Court need not address whether such an exception exists in light of its decision that Defendants are estopped from asserting exhaustion as a defense.[2]

## C. Statute of Limitations for State Law Harassment Claims[3]

Defendants argue that acts of discrimination occurring prior to December 11, 2009 are time-barred. (ECF No. 17 at 9). In Ohio, discrimination claims are governed by a six-year statute of limitations. *Cosgrove v. Williamsburg of Cincinnati Mgt. Co.*, 638 N.E.2d 991, 994 (Ohio 1994); *see also Chapa v. Genpak, L.L.C.*, 2014-Ohio-897, ¶¶ 100-101 (applying six-year statute of limitations). In *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 380–81 (1982), the Supreme Court recognized the "continuing violation" theory in the discrimination context,

_____

[2] Futility would not be available to Ms. Morningstar here. In order to show that filing a charge with the EEOC would be futile, a plaintiff must show that the EEOC has taken a "firm stand" against a plaintiff's position. *See Tillman v. Luray's Travel*, 137 F. Supp. 3d 315, 330–31 (E.D.N.Y. 2015) ("[B]ecause discrimination based on race is not a position against which the EEOC . . . [has] taken a 'firm stand,' [plaintiff] cannot avail himself to the futility exception."); *see also Fowlkes*, 790 F.3d at 386 (finding that plaintiff "may have a colorable argument that filing a charge alleging discrimination based on his transgender status would have been futile" when "EEOC had developed a consistent body of decisions that did not recognize Title VII claims based on the complainant's transgender status"). Here, Ms. Morningstar does not allege that the EEOC has taken a firm stand against her position. Indeed, such an argument would be difficult to make, given that the EEOC clearly recognizes gender discrimination. Instead, she argues that "[t]he agency in question is the City of Circleville and its firm stance against finding any such discrimination from its own acts and the acts of its own fire department is apparent." (ECF No. 33 at 25). But the agency in question is not the City—it is the EEOC.

[3] As a preliminary matter, this Court has pendent jurisdiction over Ms. Morningstar's state law claims. Under *United Mine Workers of America v. Gibbs*, 383 U.S. 715, 725 (1966), a district court has the power to exercise pendent jurisdiction over state law claims when the state and federal claims derive from a common nucleus of operative fact. Under *Gibbs*, a federal court should "consider and weigh in each case, and at every stage of the litigation, the values of judicial economy, convenience, fairness, and comity in order to decide whether to exercise jurisdiction." *Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 350 (1988). Here, the considerations of convenience and fairness to the parties weigh heavily in favor of the Court retaining pendent jurisdiction, as both parties stated at oral argument that they wish for this Court to decide the state law claims on the merits. The interest of judicial economy also weighs in favor of this Court deciding the state law claims on the merits, because the case has been pending on the docket for over two years, discovery is complete, and the summary judgment motion is ripe for decision. *See Aschinger v. Columbus Showcase Co.*, 934 F.2d 1402, 1412 (6th Cir. 1991). Finally, the state law discrimination claims are interpreted in the same manner as federal discrimination claims, making the argument for exercising pendent jurisdiction particularly strong. *See Rosado v. Wyman*, 397 U.S. 397, 404 (1970) (the "argument for exercise of pendant jurisdiction is particularly strong" when the state question is "essentially one of federal policy.").

holding: "Where a plaintiff challenges not just one incident of conduct . . . that continues into the limitations period, the complaint is timely when it is filed within [the applicable timeframe] of the last asserted occurrence of that practice." 455 U.S. at 380-81. After *Havens*, the Sixth Circuit recognized two categories of "continuous violations": (1) "where there is some evidence of *present* discriminatory activity giving rise to a claim of a continuing violation"; and (2) where there is "a longstanding and demonstrable policy of discrimination." *Haithcock v. Frank,* 958 F.2d 671, 677–78 (6th Cir. 1992) (citing *Dixon v. Anderson,* 928 F.2d 212, 217 (6th Cir.1991)).

The Sixth Circuit had to reexamine its continuing violation doctrine after the Supreme Court decided *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 105 (2002). There, the Court differentiated between discrimination claims alleging discrete acts of discrimination and hostile environment claims. The Court held that "discrete discriminatory acts are not actionable if time barred, even if they are related to acts alleged in a timely filed [claim]." 536 U.S. at 113. The Court noted that "[d]iscrete acts such as termination, failure to promote, denial of transfer, or refusal to hire are easy to identify" and held that "[e]ach discrete, discriminatory act starts a new clock." *Id.* at 113-114. Thus, the Court found that discrete acts that occurred outside the relevant time period were barred. *Id.* at 114-115.

Turning to hostile environment claims, the *Morgan* Court found that their "very nature involves repeated conduct" and thus, the unlawful employment practice "cannot be said to occur on any particular day." *Id.* at 115. Instead, the conduct "occurs over a series of days or perhaps years, and, in direct contrast to discrete acts, a single act of harassment may not be actionable on its own." *Id.* The Court concluded that a hostile work environment claim "will not be time barred so long as all acts which constitute the claim are part of the same unlawful employment practice and at least one act falls within the time period." *Id.* at 122.

16

After *Morgan*, the Sixth Circuit addressed the continuing validity of the two categories of continuing violation it previously recognized. In *Sharpe v. Cureton*, 319 F.3d 259, 268 (6th Cir. 2003), the court held that "*Morgan* overturned prior Sixth Circuit law addressing serial violations, *i.e.*, plaintiffs are now precluded from establishing a continuing violation exception by proof that the alleged acts of discrimination occurring prior to the limitations period are sufficiently related to those occurring within the limitations period." 319 F.3d at 268. Thus, the only remaining category recognized in the Sixth Circuit is the second category, involving longstanding, demonstrable policies of discrimination. *Id.*

Here, Defendants argue that the following claims of discrimination are time-barred because they fall outside the applicable six-year statute of limitations: (1) the claim that Ms. Morningstar was required to undergo a physical agility test in 2003; (2) the claim that Ms. Morningstar did not receive her equipment until 2007; (3) the claim that Ms. Morningstar was not selected as a full-time firefighter in 2005; (4) the claim that Ms. Morningstar's class was required to undergo an altered physical agility test in 2007; and (5) the claim that Ms. Morningstar was placed on a 90-day probationary period in 2007. (ECF No. 17 at 9). Ms. Morningstar argues first that these acts can be considered in regards to her hostile work environment claims. Defendants do not appear to dispute that argument. *See* ECF No. 17 at 9 ("[N]one of the aforementioned allegations can be considered in this Court's *disparate treatment* analysis.") (emphasis added). Indeed, under *Morgan*, these acts can all be considered in the hostile work environment analysis, since Ms. Morningstar alleges some actions that do fall within the limitations period, such as tampering with her safety equipment, staining her bed with semen, and urinating in her shampoo bottle. (ECF No. 16-7 at 124, 127, 135, 137-39). Thus, the Court will consider all of the actions when analyzing the hostile work environment claims. *See*

*Austion v. City of Clarksville*, 244 F. App'x 639, 650 (6th Cir. 2007) (finding plaintiff can rely on past incidents, including time-barred acts of discrimination, in establishing his hostile work environment claim).

As to whether the acts can be considered in her disparate treatment claim, the Court finds that Ms. Morningstar has demonstrated a longstanding and demonstrable policy of discrimination, so her allegations fall into the continuing violation category that remained untouched after *Sharpe*. It is generally true that to establish this category of continuing violation, a plaintiff must demonstrate "more than the existence of discriminatory treatment in [her] case." *See Wu v. Tyson Foods, Inc.*, 189 F. App'x 375, 379 (6th Cir. 2006) (internal quotations omitted). Here, however, Ms. Morningstar is undisputedly the first female ever hired as a full-time firefighter by the Circleville Defendants. The CFD Captain who gave Ms. Morningstar's hiring class the agility test—which was made harder for her class despite warnings that it would "look bad"— wrote "Unfortunately it is time to allow a female into the department" after Ms. Morningstar passed the test. He also is alleged to have stated: "It looks like it's time to make this test harder." (ECF No. 16-7 at 113; ECF No.16-2. at 86). These remarks, in conjunction with the multitude of incidents Ms. Morningstar endured for over a decade at CFD, are sufficient to show a longstanding and demonstrable policy of discrimination. *See Roberts v. N. Am. Rockwell Corp.*, 650 F.2d 823, 827 (6th Cir. 1981) (finding established policy of not hiring women sufficient to show continuing violation). Thus, the Court will consider all of the evidence in analyzing the disparate treatment claim.

### D.       Discrimination Claims Against Chief Zingarelli

Defendants next argue that Chief Zingarelli is statutorily immune from the discrimination and harassment claims. (ECF No. 17 at 10). It is undisputed that Title VII does not impose

individual liability on employees.  *See Wathen v. Gen. Elec. Co.*, 115 F.3d 400, 406 (6th Cir. 1997) ("[W]e find that [Title VII] as a whole, the legislative history and the case law support the conclusion that Congress did not intend individuals to face liability under the definition of 'employer' it selected for Title VII.").  The parties dispute, however, whether Chief Zingarelli can be liable under the Ohio discrimination statute.

In Ohio, an employee of a political subdivision is statutorily immune from tort liability with three exceptions—the political subdivision employee is not entitled to immunity if: (1) their acts or omissions were manifestly outside the scope of their employment; (2) their acts or omissions were committed with malicious purpose, in bad faith, or in a wanton or reckless manner; or (3) liability is expressly imposed upon them by a provision of the Ohio Revised Code.  O.R.C. § 2744.03(A)(6).

Ms. Morningstar brings her discrimination claims under Ohio Revised Code § 4112.02(A), which makes it unlawful:

> For any employer because of the race, color, religion, sex, military status, national origin, disability, age, or ancestry of any person, to discharge without just cause, to refuse to hire, or otherwise to discriminate against that person with respect to hire, tenure, terms, conditions, or privileges of employment, or any matter directly or indirectly related to employment.

Ohio Rev. Code Ann. § 4112.02(A).  "Employer" is defined as "the state, any political subdivision of the state, any person employing four or more persons within the state, and any person acting directly or indirectly in the interest of an employer."  Ohio Rev. Code Ann. § 4112.01(2).  In *Hauser v. Dayton Police Dep't*, 17 N.E.3d 554, 557 (Ohio 2014), the Ohio Supreme Court held that the definition of "employer"—even though it includes those acting in the interest of an employer—does not expressly impose civil liability on managers and supervisors of political subdivisions, for the purposes of the third immunity exception in O.R.C.

§ 2744.03(A)(6); *see also Gibbs v. Meridian Roofing Corp.*, No. 1:17-CV-245, 2017 WL 6451181, at *5 (S.D. Ohio Dec. 18, 2017) (under Ohio's discrimination statute, an employer can be vicariously liable for the actions of its employees, but there is no express cause of action against individual agents of the employer).

Defendants rely on *Hauser* to argue that employees of subdivisions are immune from claims brought by a fellow employee under the discrimination statute, and thus Chief Zingarelli is entitled to immunity. Ms. Morningstar, however, argues that Chief Zingarelli acted with malice, in bad faith, or in a wanton or reckless manner, and thus is not entitled to immunity under the second exception of O.R.C. § 2744.03(A)(6), not the third exception, which was at issue in *Hauser*. Even if Ms. Morningstar shows that Chief Zingarelli acted with the requisite malice or bad faith, however, she still cannot bring a cause of action against him under Ohio's discrimination statute. The *Hauser* court held that "R.C. 4112.02(A) subjects employers to vicarious liability [but does] expressly impose liabilities on individual employees." 17 N.E.3d at 558.

The Ohio Supreme Court previously held that a plaintiff could bring a cause of action against an individual under R.C. 4412.02, basing its conclusion, in part, on the fact that the definition of "employer" in the state statute "differs in several critical aspects from its Title VII counterpart." *Genaro v. Central Transport, Inc.*, 84 Ohio St.3d 293, 299-300 (1999). The court's reasoning in *Genaro* was contradicted by the court's reasoning in *Hauser*, where the court found that there are "no material differences" between the Ohio statute and the analogous Title VII provision which does not allow a suit against an individual. *See Longoria v. Autoneum N. Am., Inc.*, No. 3:14CV2648, 2015 WL 6658675, at *5 (N.D. Ohio Oct. 30, 2015) (discussing the differences between *Genaro* and *Hauser*). The *Hauser* court itself noted that its "reasoning .

. . calls the *Genaro* majority's reasoning into question" but expressly declined to "decide whether" to overrule *Genaro*, finding that because *Genaro* did not deal with immunity, it was not binding precedent. 17 N.E.3d at 559-560. The *Hauser* court further differentiated *Genaro* by stating that *Genaro* "involved *private*-sector supervisors and managers" as opposed to employees of political subdivisions. *Id.* (emphasis in original).

Courts that have addressed the issue of whether a plaintiff can bring a cause of action against an individual employee under R.C. 4112.02 in the wake of *Hauser*—including this court—have declined to allow such an individual action to proceed. *See Gibbs v. Meridian Roofing Corp.*, No. 1:17-CV-245, 2017 WL 6451181, at *5 (S.D. Ohio Dec. 18, 2017) ("Defendants argue that . . . neither the ADA nor Ohio Revised Code § 4112.02(A) provides a cause of action for . . . discrimination against individual employees. . . . The Court agrees."); *Rosecrans v. Vill. of Wellington*, No. 1:15CV0128, 2016 WL 165450, at *4–5 (N.D. Ohio Jan. 14, 2016) ("Therefore, Plaintiff's age discrimination claims brought under Sections 4112.02(A) . . . fail against O'Keefe because she is not an employer as defined by statute or Ohio law."); *See also Longoria*, 2015 WL 6658675, at *5 ("Although I am inclined to agree with defendants *Genaro* is no longer good law, I need not definitively tackle the issue here."). Given that the continuing validity of *Genaro* is called into question by *Hauser*, and that *Hauser* distinguished *Genaro* on the basis of whether the employer was in the public sector or the private sector—making this case more analogous to *Hauser* than *Genaro*— this Court concludes that the gender discrimination and hostile work environment claims cannot proceed against Chief Zingarelli. Therefore, summary judgment on **Counts I, III, VI,** and **VII** is **GRANTED** as to **CHIEF ZINGARELLI**.

### E.    Discrimination Claims Against the Circleville Defendants

#### 1.    Gender Discrimination Claim

Ohio courts "reviewing discrimination claims under R.C. Chapter 4112 refer to federal case law interpreting Title VII of the Civil Rights Act of 1964." *Waddell v. Grant/Riverside Med. Care Found.*, 2017-Ohio-1349, ¶ 25, 88 N.E.3d 664, 675, *appeal not allowed*, 2018-Ohio-365, ¶ 25, 151 Ohio St. 3d 1503, 90 N.E.3d 946. Thus, "the formula set forth by the United States Supreme Court in *McDonnell Douglas Corp. v. Green* (1973), 411 U.S. 792" applies to both the federal claims and the claims for "disparate treatment in violation of R.C. Chapter 4112." *See Sutherland v. Nationwide Gen. Ins. Co.*, 96 Ohio App. 3d 793, 800, 645 N.E.2d 1338, 1343 (1994). The *McDonnell Douglas* framework involves three steps. First, the "plaintiff bears the initial burden of establishing a prima face case of discrimination." *Waddell,* 88 N.E.3d 664 at 676. Plaintiff satisfies this burden by proving: "(1) membership in a protected class; (2) that she suffered an adverse action; (3) that she was qualified for the position; and (4) that she was replaced by, or treated differently than, someone outside the protected class." *Laderach v. U-Haul of Nw. Ohio*, 207 F.3d 825, 828–29 (6th Cir. 2000). Establishing a prima face case is not meant to be an onerous task. *Reynolds v. Chipotle Mexican Grill, Inc.*, 120 F. Supp. 3d 704, 713–14 (S.D. Ohio 2015).

If the plaintiff establishes a prima face case, the burden shifts to the employer in the second step to "articulate a legitimate, non-discriminatory reason for taking the adverse action." *Id.* This burden is one of "production" not of "persuasion"—it is met if it "introduces evidence which, *taken as true*, would *permit* the conclusion that there was a nondiscriminatory reason for the adverse action." *Waddell,* 88 N.E.3d 664 at 676 (internal citations omitted) (emphasis in original). Finally, if the defendant meets its burden, the plaintiff then must prove that "the

proffered reason is a pretext for discrimination" which can be done by demonstrating that: (1) the defendant's reason has no basis in fact; (2) the reason given is not the actual reason for the termination; or (3) the reason is insufficient to explain defendant's action. *Reynolds*, 120 F. Supp. 3d at 713–14 (internal citations omitted). The burden in the final step "merges with the ultimate burden of persuading the court that [plaintiff] has been the victim of intentional discrimination." *Waddell,* 88 N.E.3d 664 at 677. In other words, at the third stage, the question is "did the employer fire the employee [or take other adverse action] for the stated reason or not?" *Tingle v. Arbors at Hilliard,* 692 F.3d 523, 530 (6th Cir. 2012).

Applying the first step of the *McDonnell Douglas* framework here, it is undisputed that Ms. Morningstar meets the first prong necessary to establish a prima face case—as a female, she is a member of a protected class. As to the second prong, Ms. Morningstar argues that she suffered adverse employment action as a result of multiple events: (1) when she was required to undergo a physical agility test to volunteer in 2003; (2) not receiving her equipment until 2007; (3) not being selected as a full-time firefighter in 2005; (4) when she was required to undergo an altered physical agility test in 2007; (5) when she was placed on a 90-day probationary period in 2007; (6) when she was passed over for the lieutenant promotion; and (7) when she was terminated from her employment.[4]

---

[4] In addition to the listed acts, Defendants also state that Ms. Morningstar argues that being placed on administrative leave pending the investigation into Jerry Cornwell was an adverse employment action. (ECF No. 17 at 12). Defendants cite to Sixth Circuit cases holding that an employee's placement on paid administrative leave pending the outcome of an internal investigation does not constitute an adverse employment action. *See, e.g.*, *Dendinger v. Ohio*, 207 F. App'x 521, 527 (6th Cir. 2006). Those cases, however, are easily distinguishable: they all involve administrative leave pending an investigation relating to the plaintiff's own misconduct. *See Peltier v. United States*, 388 F.3d 984, 988 (6th Cir. 2004) ("a suspension with pay and full benefits pending a timely investigation into *suspected wrongdoing* is not an adverse employment action") (internal citations omitted) (emphasis added). Here, Ms. Morningstar is not accused of any wrongdoing herself—she accused Jerry Cornwell of wrongdoing. Thus, the Court disagrees that being forced to go on administrative leave after accusing another individual of sexual harassment could not constitute an adverse employment action. Under the facts of this case however, the Court will not consider this event. Ms. Morningstar does not mention it in her brief, and she herself

An adverse employment action is a "materially adverse change in the terms or conditions of employment because of the employer's conduct." *Mitchell v. Vanderbilt University*, 389 F.3d 177, 182 (6th Cir. 2004) (internal citations omitted). A "mere inconvenience or an alteration of job responsibilities" does not constitute a material change. *Id.* (holding that deprivation of a graduate research assistant for a summer, revocation of mentor status, and removal from position as Medical Director of Pathology Laboratory Services do not amount to adverse employment actions). Defendants argue that neither physical agility test can be considered an adverse employment action because she passed both tests. This Court agrees—Ms. Morningstar did not experience a materially adverse change in her employment because of the agility tests. The remaining five claims, however, are sufficient to constitute adverse employment actions.

Defendants argue that the incidents that occurred when she was a volunteer cannot constitute an adverse action because she did not have an employment relationship with the City or CFD. (ECF No. 17 at 12). The Sixth Circuit has held, however, that "volunteers potentially may be employees for the purposes of Title VII." *Marie v. Am. Red Cross*, 771 F.3d 344, 352 (6th Cir. 2014) (citing *Bryson v. Middlefield Volunteer Fire Dep't, Inc.,* 656 F.3d 348, 353 (6th Cir.2011)). Courts analyze the *Darden* agency factors to determine if a volunteer is an employee. *Bryson*, 656 F.3d at 354-55. These factors include: the employer's right to control the manner and means by which the product is accomplished; the source of the instrumentalities and the tools; skill required; the location of the work; the duration of the relationship between the parties; the hired party's discretion over when and how to work; the method of payment; whether the work is part of the regular business of the hiring party; the provision of employee benefits;

<hr>

initiated the leave by requesting to take a few days off after she reported the harassment. (ECF No. 16-7 at 180).

and the tax treatment of the hired party. *Nationwide Mut. Ins. Co. v. Darden*, 503 U.S. 318, 324, (U.S. 1992).

Analyzing the factors here, CFD controlled the manner in which she worked, she performed tasks that were part of CFD's regular business, she worked at the firehouse with the rest of CFD's employees, and she volunteered for four years. Thus, Ms. Morningstar's volunteer relationship with the Circleville Defendants is sufficient to constitute employment for the purposes of the discrimination statutes. *See Bryson*, 656 F.3d at 355 (finding district court erred in granting summary judgment to defendant fire department when evidence showed volunteer firefighters received worker's compensation coverage, gift cards, personal use of the Department's facilities and assets, training, and access to an emergency fund). Ms. Morningstar's claims regarding not receiving her equipment and not being hired as a full-time firefighter in 2005 both constitute adverse actions, then, as both resulted in significantly diminished material responsibilities or terms of employment. Without her equipment, she was not able to go on any fire runs. And being a paid, full-time firefighter is certainly a change in employment status from being a volunteer. Contrary to Defendants' argument, Ms. Morningstar also suffered adverse employment action when she was placed on a longer probation period than other new hires—while she may have received full pay and benefits, she was no doubt subject to significantly diminished material responsibilities, since she was not able to perform *any* responsibilities at work.

That leaves Ms. Morningstar's failure to promote and termination claims. Defendants make no argument that failure to promote is not sufficient to constitute an adverse employment action—and indeed, it is. *See White v. Baxter Healthcare Corp.*, 533 F.3d 381, 402 (6th Cir. 2008) ("An adverse employment action is an action by the employer that constitutes a significant

change in employment status, such as . . . failing to promote") (internal quotations omitted). Thus, even without her termination claim, Ms. Morningstar has presented sufficient evidence to satisfy this prong. Defendants argue that her termination should not be considered here, since it occurred after the complaint was filed and thus is not pled. Defendants, however, were the first ones to make Ms. Morningstar's termination an issue by alleging in their Statement of Facts that she "abandon[ed] her job" and attaching her termination letter to their motion (ECF No. 17 at 6; Ex. D). Additionally, she has already shown sufficient evidence of adverse action without the termination claim. Under these circumstances, the Court will consider the facts surrounding Ms. Morningstar's termination. The Court will not, however, consider the constructive discharge claim Ms. Morningstar alleges for the first time in her Response in Opposition to Defendants' Motion.

Moving on to the third prong of the prima facie case, Ms. Morningstar alleges that she was qualified at all times, including for both the Lieutenant position and the position she held when she was terminated. (ECF No. 24 at 24). The evidence shows Ms. Morningstar had been employed by the City and CFD as a full-time firefighter since 2007. (ECF No. 16-7 at 18). She attended Eastland Career Center where she obtained her "240 fire card," did arson investigations through the Ohio Fire Academy, and has an inspection certification through the Ohio Fire Academy. (*Id.* at 11-12). Captain Rankin described her as a "good firefighter, good pump operator, excellent medic, excellent personnel skills or personal skills dealing with patients, always respectful, and willing to work and do whatever she needed." (ECF No. 16-8 at 31). He further stated that she "wanted to go above and beyond to be there." (*Id.*). Lieutenant Moorehead testified that "[s]he was a good medic, had a caring attitude on emergency runs . . . was good at operating vehicles, a good pump operator." (ECF No. 16-1 at 73). He further

testified that she "could do everything any other firefighter could do" and that as her lieutenant, he "could not complain about her job performance at all." (*Id.*). Defendants, argue, however, that she was not qualified to become a lieutenant because she failed the civil service exam. (ECF No. 27 at 8). But the Sixth Circuit has cautioned district courts "not to conflate the qualification prong of a prima facie case with the employer's asserted justification for the adverse action." *Reynolds*, 120 F. Supp. 3d at 722 (citing *Loyd v. St. Joseph Mercy Oakland*, 766 F.3d 580, 590 (6th Cir.2014)). Instead, a "plaintiff's qualifications must be measured objectively, and the Court may not consider the employer's explanation for the adverse action while evaluating those qualifications." *Id.* Taking Ms. Morningstar's evidence of qualifications objectively, the Court finds that she met her prima face burden of showing that she was qualified.

Finally, as to the last prong of her prima facie case, Ms. Morningstar argues that she was treated differently than similarly situated male employees. With regards to the failure to promote claim, Ms. Morningstar submitted evidence that Chief Zingarelli called her a "bitch" in front of the agency administering the test. (ECF No. 16-7 at 81). None of the men taking the test was subjected to gender-related insults directly prior to taking the examination. She also submitted evidence that Chief Zingarelli told her not to bother taking the test, as she would not pass. (ECF No. 16-7 at 152). Defendants argue that she cannot establish that she was treated differently because she took the same exam as the other applicants and a male firefighter that failed the exam was also not selected. Defendants further point to evidence that Ms. Morningstar herself used profanity and never indicated that she was offended by it. (ECF No. 16-7 at 74-75; ECF No. 16-8 at 84). Examining all of the evidence, the Court concludes that there is at least a genuine dispute of material fact as to whether the verbal harassment Ms. Morningstar

experienced directly before the test—in front of the test examiners—is sufficient for her to show that she has been treated differently than her similarly situated male colleagues.

In regards to her termination claim, Ms. Morningstar presented evidence that she was treated differently than Captain Aaron Kerns because he failed to report to work for three days but was not terminated. (ECF No. 16-8 at 96-97). The testimony shows that Aaron Kerns did not fill out the necessary paperwork to take time off. Instead of being terminated for his failure to do so, Chief Zingarelli helped him fill out paperwork after the fact. (ECF No. 16-8 at 96-97; ECF No. 22-1 at 27-29). Ms. Morningstar, on the other hand, failed to show up to work and received a termination letter. (ECF No. 16-7; Ex. 13). Defendants argue that Ms. Morningstar was not similarly situated to Captain Kerns because she took five days off, whereas he took three. But "'[s]imilarly situated' does not mean 'identically situated.'" *Reynold*, 120 F. Supp. 3d at 735. The two-day difference here is insubstantial, given that the policy states that three days of no-call, no-show is sufficient for termination and Captain Kerns was absent for three days. (ECF No. 17 at Ex. D). Defendants also argue that Captain Kerns was not similarly situated to Ms. Morningstar because he gave notice to his supervisor that he would be off, and merely failed to fill out the paperwork, whereas Ms. Morningstar did not provide notice. Ms. Morningstar claims that she was seeking assurances from Defendants that she would be provided a safe work environment to which to return. Whether CFD was on notice that Ms. Morningstar would be off of work immediately after filing this lawsuit and using her unpaid leave is a question best left to the jury.

As for the remaining claims of discrimination, Ms. Morningstar meets her burden of showing she was treated differently than similarly situated male employees with respect to all but her claim that she was not hired as a full-time employee in 2005. All male employees who took

the test to become full-time firefighters in 2005 and did not score in the top-tier were not hired, and Ms. Morningstar can point to no male who did not score in the top tier but was still hired. She does show that male volunteers received their equipment in a much shorter time frame and that male new-hires were subject to a shorter probation period, so these claims will survive.

Turning to the second step in *McDonnell Douglas*' burden shifting framework, Defendants do not offer any legitimate non-discriminatory reason for taking four years to provide Ms. Morningstar with her gear or for requiring her to endure a 90 day, rather than 30 day, probationary period. They do articulate legitimate non-discriminatory reasons for the remaining employment decisions at issue, namely that Ms. Morningstar was not promoted because she failed the lieutenant exam, and she was terminated because she failed to show up to work for five days in a row without notifying her supervisor. (ECF No. 27 at 10). Thus, under the final step of the analysis Ms. Morningstar must show that the proffered reasons are pretext for discrimination. The Sixth Circuit has held that "in order to survive summary judgment a plaintiff need only produce enough evidence to support a prima facie case and to rebut, but not to disprove, the defendants proffered rationale." *Reynolds*, 120 F. Supp. 3d at 714 (internal citations omitted).

Ms. Morningstar does so here. She argues that the reason given for her termination is insufficient to explain the defendant's actions, since she introduced evidence that Captain Kerns was in a substantially similar position and was not fired. The Court already found that there is an issue of fact surrounding this allegation. Further, taking into account Ms. Morningstar's allegations of a long history of being discriminated against at CFD—including being forced to undergo tougher agility tests, being the only volunteer to have to wait four years to receive equipment, being the only firefighter to be placed on a 90-day probationary period after being

hired, being called a "bitch" before the lieutenant exam, and being called a "bitch" at the meeting where she reported being sexually assaulted by another employee—the Court concludes that a reasonable jury could find that CFD was not motivated by legitimate reasons when it terminated Ms. Morningstar soon after she filed the instant lawsuit, or took any of the other adverse employment actions. *See Dunnom v. Bennett*, 290 F. Supp. 2d 860, 870–71 (S.D. Ohio 2003); *see also Laderach v. U-Haul of Nw. Ohio*, 207 F.3d 825, 829–30 (6th Cir. 2000) (denying summary judgment when Plaintiff "may be able to prove that her sex played a part in the appellees' decisions notwithstanding" her alleged lack of experience and errors on the job). Indeed, because "inquiries regarding what actually motivated an employer's decision are very fact intensive such issues will generally be difficult to determine at the summary judgment stage and thus will typically require sending the case to the jury." *White*, 533 F.3d at 402 (internal quotations omitted). Thus, Summary Judgment as to **Count I** is **DENIED** as to her claims of disparate treatment for the following incidents: (1) receiving her equipment four years after she started volunteering; (2) being placed on a 90-day probationary period in 2007; (3) being passed over for a promotion; and (4) being terminated.

2.     Hostile Work Environment Claim[5]

As with a claim for gender discrimination, a hostile work environment claim under Ohio Revised Code § 4112 tracks a federal Title VII claim. *See Southerland v. Sycamore Cmty. Dist. Bd. of Educ.*, 277 F. Supp. 2d 807, 816–17 (S.D. Ohio 2003). "For sexual harassment to be actionable, it must be sufficiently severe or pervasive to alter the condition of the victim's employment and create an abusive working environment." *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 67 (1986) (internal quotations omitted). To prevail on a sexual harassment claim,

---

[5] Both parties treat the Hostile Work Environment Claim (VI) and the Sexual Harassment Claim (VII) as one claim. The Court will therefore discuss them together.

"a plaintiff must establish that the harassment was because of plaintiff's gender and that it created a hostile work environment." *Southerland*, 277 F. Supp. 2d at 811–12 (citing *Mast v. IMCO Recycling of Ohio, Inc.,* 58 Fed. Appx. 116, 118, 2003 WL 247109, *1–2 (6th Cir.2003)). In order to "establish a hostile work environment, plaintiff must demonstrate that the charged sexual harassment had the effect of unreasonably interfering with the plaintiff's work performance and creating an intimidating, hostile, or offensive working environment that affected seriously the psychological well-being of the plaintiff. *Id.* (citing *Rabidue v. Osceola Refining Co.,* 805 F.2d 611, 619 (6th Cir.1986), *cert. denied,* 481 U.S. 1041 (1987), *see also Harris v. Forklift Sys. Inc.,* 510 U.S. 17, 21 (1993).

In determining whether a plaintiff has established a hostile work environment, the Court considers "a reasonable person's reaction to a similar environment under like circumstances." *Dunnom v. Bennett*, 290 F. Supp. 2d 860, 871 (S.D. Ohio 2003) (internal citations omitted). The Court must "examine all the circumstances, including the frequency of the conduct, its severity, whether it is physically threatening or humiliating or merely offensive, and whether it unreasonably interferes with an employee's work performance." *Id.* (citing *Faragher v. City of Boca Raton,* 524 U.S. 775, 787–88 (1998)). Once the plaintiff establishes a hostile working environment, she must establish that her employer bears responsibility for the harassment, which entails showing that her employer knew or should have known of the harassment and failed to take proper remedial action. *Southerland*, 277 F. Supp. 2d at 811–12 (S.D. Ohio 2003).

In summary, to prevail on a hostile environment claim, "a plaintiff must show that (1) she was a member of a protected class; (2) she was subjected to unwelcome harassment; (3) the harassment complained of was based on her sex; (4) the harassment created a hostile work

environment; and (5) the employer is liable." *Graves v. Dayton Gastroenterology, Inc.*, 657 F. App'x 485, 487–88 (6th Cir. 2016).

Defendants concede that Ms. Morningstar meets the first two elements, but disputes the final three. First, Defendants argue that Ms. Morningstar cannot establish that the acts occurred because of her gender. But Defendants only point to the equipment tampering and pranks, arguing that since she cannot identify who committed the acts and other firefighters experienced pranks as well, they were not based on her gender. This argument is unpersuasive for several reasons. First, while it is true that there is evidence suggesting that other firefighters experienced some of the pranks, such as clothes-tampering, Ms. Morningstar is the only firefighter who experienced other so-called pranks, such as tampering with her safety mask and discovering a "semen-like" substance on her bed sheets. (ECF No. 16-6 at 87-88; ECF No. 16-7 at 124, 127, 135, 139). The nature of the semen prank is enough to infer that the prank was because of her gender.

Second, the Court should not view the "pranks" in a vacuum. *See Williams v. Gen. Motors Corp.*, 187 F.3d 553, 563 (6th Cir. 1999) ("Courts must be mindful of the need to review the work environment as a whole, rather than focusing single-mindedly on individual acts of alleged hostility."). Looking to the other acts of harassment, the record is sufficient to infer that "gender was the motivating impulse" *Id*. at 565–66. The evidence shows that she was called a "slut," a "whore," a "bitch," and a "cunt"—all of which are "sex-specific terms and derogatory terms" that can be used to prove the acts were motivated by her gender. *See Wade v. Automation Pers. Servs., Inc.*, 612 F. App'x 291, 297 (6th Cir. 2015) (internal citations omitted). Even "harassing behavior that is not sexually explicit but is directed at women and motivated by discriminatory animus against women satisfies the "based on sex" requirement." *Williams*, 187

F.3d at 565.  Thus, Captain Edgington's comment that "It looks like its time to make this test harder" after Ms. Morningstar passed the test in 2007, and his comment that "Unfortunately it is time to allow a female into the department," each satisfy the "based on sex" requirement.  (ECF No. 16-7 at 113; ECF No. 16-2 at 69-70).  And, of course, Ms. Morningstar—the only female firefighter—was physically assaulted by Jerry Cornwell.  Thus, Ms. Morningstar satisfied the third prong.

Next, Defendants argue that the harassment did not create a hostile work environment because it did not interfere unreasonably with her work performance.  Specifically, they argue that there is no evidence that the pranks or equipment tampering interfered with her work performance because she stayed at the fire department for years.  To show such an interference, however, Ms. Morningstar "need only show that the harassment made it more difficult to do the job." *Davis v. Monsanto Chem. Co.*, 858 F.2d 345, 349 (6th Cir.1988).  There is at least a dispute of fact as to whether the aggregation of the harassment experienced by Ms. Morningstar made her work more difficult—it does not stretch the imagination to conclude that it could.  She was constantly called gender-biased names by her supervisor—including right before she took a test and right after she reported sexual harassment, she was subjected to grotesque pranks including finding a semen-like substance on her bed sheet, her life-saving equipment was tampered with, and she was physically assaulted by a male employee.  One firefighter testified that some of the pranks such as the semen were "crossing the line."  (ECF No. 16-1 at 93, 96, 98, 100).  Another firefighter testified that tampering with someone's mask was "very, very dangerous" and if it "failed during an event that could be potentially harmful."  (ECF No. 16-3 at 52).  Thus, "rather than constituting merely oafish behavior, the pranks, seen as part of the constellation of

surrounding circumstances . . . could well be viewed as work-sabotaging behavior that creates a hostile work environment." *Williams*, 187 F.3d at 563–64

Defendants' arguments that the use of profanity was common in the CFD and that she never informed Chief Zingarelli that she was offended by his language are not fatal to Ms. Morningstar's claim. First, this Court "do[es] not view a co-worker's saying 'Hey, slut'" (let alone cunt) as merely "foul language in the workplace." *Id.* at 563. This Court "reject[s] the view that the *standard* for sexual harassment varies depending on the work environment. *Id.* at 564. A "woman who chooses to work in the male-dominated trades" does not " relinquish[] her right to be free from sexual harassment." *Id.* Thus, the fact that profanity is common in the CFD is not dispositive. Additionally, "a plaintiff's failure to report alleged harassment is not relevant to [the] analysis of the threshold question-whether the plaintiff in this case has established a hostile work environment." *Id.* at 567. And Ms. Morningstar did indeed report some instances of harassment, including Jerry Cornwell's physical advances, the semen on her bed, and the tampering with her safety mask. (ECF No. 16-7 at 124, 127, 135, 137-139, 146; ECF No. 16-2, Ex. 8, Ex. 11). Overall, the "accumulated effect" of the incidents Ms. Morningstar experienced, at the very minimum, established a question of fact as to whether her work environment was hostile and whether she perceived it to be so. *Williams*, 187 F.3d at 563-64; *see also Wade v. Automation Pers. Servs., Inc.*, 612 F. App'x 291, 300 (6th Cir. 2015) (characterizing *Williams* as finding that "the pervasive, extremely offensive comments, physical contact, and threats towards the female plaintiff in a male-dominated trade constitutes conduct that was frequent, severe, threatening, and humiliating.")

The only remaining question, then, is whether Defendants can be liable for the hostile environment. Defendants first argue that they have a sexual harassment policy, the existence of which can be used as an affirmative defense. (ECF No. 17 at 17). Ohio courts have held that:

> When harassment by a supervisor with authority over the employee culminates in a tangible employment action against the plaintiff, the employer is subject to vicarious liability and the analysis ends. Where no tangible employment action was taken, but a hostile work environment was created, the employer may avail itself of an affirmative defense to liability. To successfully raise this affirmative defense, an employer must establish two elements by a preponderance of the evidence: first, that the employer exercised reasonable care to prevent and correct properly any sexually harassing behavior, and second, that the plaintiff-employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise.

*Osborne v. Douglas*, 2013-Ohio-5072, ¶ 83. First, Ms. Morningstar has alleged that all of the harassment by her supervisor, Chief Zingarelli, has culminated in a tangible employment action—her termination. Thus, the analysis could end here.

Even if not, there is a genuine dispute of material fact as to whether Defendants "exercised reasonable care to prevent and correct" any sexually harassing behavior. Defendants focus on the acts that they took after Ms. Morningstar made a formal complaint about Jerry Cornwell in March of 2015 and after she filed a report on June 18, 2015 alleging incidents of harassment by Chief Zingarelli, arguing that these actions were reasonable. But even if that were true, there is a question of fact as to whether the Circleville Defendants knew or *should have known* of previous instances of harassment and whether they failed to *prevent* the harassment. For example, Ms. Morningstar alleges that she reported the tampering of her equipment and clothing to her officers (Rankin, Grant, and Wise) between 2007 and 2015, but that despite reports "nothing ceased to occur. It continued throughout [her] career there." (ECF No. 16-7 at 125, 138). Ms. Morningstar reported the first incident of harassment by Jerry Cornwell on August 18, 2014, and Lieutenant Rankin's report regarding the incident clearly states that he

35

"know[s] this is not the first time similar events have occurred between Firefighter Morningstar and Jerry Cornwell."  (ECF No. 16-2, Ex. 25).  There is a further dispute of fact as to whether Councilwoman Bowers spoke to Chief Tim Tener about Jerry Cornwell's sexual harassment of Ms. Morningstar.  Ms. Morningstar provided testimony saying Chief Tener stated he would "take care of it," while Defendants contend that Chief Tener denies any knowledge of the harassment. (ECF No. 22-1 at 35-36; ECF No. 16-6 at 107).  At a meeting held to discuss the harassment of Cornwell, Ms. Morningstar alleges that Chief Zingarelli called her a bitch and also states that she was told not to tell anyone about the harassment because they wanted to "keep it in house." (ECF No. 16-2; Ex. 11; ECF No. 16-7 at 178).  Thus, the record demonstrates that there is a genuine dispute of material fact as to whether Defendants are liable for the harassment of Ms. Morningstar.  Summary judgment as to **Counts VI and VII** is **DENIED**.

### 3.    Retaliation Claim

Plaintiff establishes a prima face claim for retaliation by showing:

> (1) that plaintiff engaged in an activity protected by Title VII; (2) that the exercise of [the plaintiff's] civil rights was known by the defendant; (3) that, thereafter, the defendant took an employment action adverse to the plaintiff; and (4) that there was a causal connection between the protected activity and the adverse employment action.

*Williams v. Gen. Motors Corp.*, 187 F.3d 553, 568 (6th Cir. 1999).  To establish a causal connection under the last prong, "a plaintiff must produce sufficient evidence from which an inference could be drawn that the adverse action would not have been taken had the plaintiff not filed a discrimination action.  *Nguyen v. City of Cleveland*, 229 F.3d 559, 563 (6th Cir. 2000). No one factor is dispositive, and "evidence that defendant treated the plaintiff differently from similarly situated employees or that the adverse action was taken shortly after the plaintiff's exercise of protected rights is relevant to causation.  *Id.*  The prima facie burden is not onerous— it is easily met.  *EEOC v. Avery Dennison Corp.,* 104 F.3d 858, 861 (6th Cir.1997).  The

employer can then show it would have taken the same action even without the protected activity.

*Thomas v. Eby*, 481 F.3d 434, 441-42 (6th Cir. 2007).

Here, Ms. Morningstar first argues that after she made a formal complaint regarding Cornwell's sexual assault, she was retaliated against by having her shift changed and being ignored by other firefighters. Defendant argues that neither of these actions constitute an "adverse action" under the third prong. Ms. Morningstar points to no cases or evidence in the record to the contrary. Thus, the Court agrees that neither a mere shift change without additional evidence of significant change in responsibility, nor being ignored by co-workers amount to adverse action. Plaintiff also argues, however, that her termination after she filed the lawsuit was retaliatory conduct sufficient to meet her prima face case. Given the court's analysis regarding her termination claim above, this Court agrees. Summary judgment in Defendants' favor as to **Count III** is **DENIED**.

### F.      Infliction of Emotional Distress Claim

As a preliminary matter, Ms. Morningstar asserts a claim for both intentional infliction of emotion distress and negligent infliction of emotional distress. (ECF No. 1 at 13). Neither defendants nor Ms. Morningstar address Ms. Morningstar's claim for negligent infliction of emotional distress, but Ohio courts have held that claims for negligent infliction of emotional distress cannot be maintained in the employment context. *Johnson v. Cox*, No. 96CA622, 1997 WL 152636, at *2 (Ohio Ct. App. Mar. 28, 1997). Thus, this claim will be dismissed and the Court will focus on the intentional infliction of emotional distress claim. To establish a claim for intentional infliction of emotional distress, Ms. Morningstar must show that:

> (1) the defendant either intended to cause emotional distress, or knew or should have known that its actions would result in serious emotional distress; (2) defendant's conduct was so extreme and outrageous as to go beyond all possible bounds of decency, and would be considered utterly intolerable in a civilized community; (3) defendant's actions

proximately caused injury to plaintiff; and (4) the mental anguish plaintiff suffered is serious and of such a nature that no reasonable person could be expected to endure.

*Osborne v. Douglas*, 2013-Ohio-5072, ¶ 52.

Ms. Morningstar argues first that "[s]exual harassment on the job is undoubtedly an intentional infliction of emotional distress." *Johnson*, 1997 WL 152636, at *4. Defendants do not refute that contention. Ms. Morningstar further argues that all "relevant evidence that was presented in support of sexual harassment was also relevant and admissible with regard to intentional infliction of emotion distress. *Hampel v. Food Ingredients Specialties, Inc.*, 729 N.E.2d 726, 740 (Ohio 2000). Defendant argues that the pranks, while "grotesque" do not go beyond all bounds of decency, nor does Chief Zingarelli's profanity, given that she cussed as well and never complained that she was offended. The Court finds that whether the pranks— such as ejaculating on Ms. Morningstar's bed—in conjunction with the offensive language of "cunt" "bitch" "slut" and "whore", and the undisputed sexual harassment by Jerry Cornwell, amount to conduct so extreme and outrageous as to go beyond all possible bounds of decency, is a factual intensive inquiry best left to the jury.

## G.     Availability of Punitive Damages

Ms. Morningstar's complaint seeks punitive damages. Defendants argue that punitive damages cannot be awarded against the City because it is political subdivision. Ms. Morningstar does not dispute this proposition. In fact, R.C. 2744.05(A) expressly provides:

> Notwithstanding any other provisions of the Revised Code or rules of a court to the contrary, in an action against a political subdivision to recover damages for injury, death, or loss to person or property caused by an act or omission in connection with a governmental or proprietary function:
> (A) Punitive or exemplary damages shall not be awarded.

*See also Hunsche v. Loveland*, 729 N.E.2d 393, 398 (Ohio Ct. App. 1999) ("In the absence of statutory authorization, neither punitive damages nor attorney fees can be awarded against a

municipal corporation."); *Speller v. Toledo Pub. Sch. Bd. of Edn.*, 38 N.E.3d 509, 520 (Ohio Ct. App. 2015) (upholding lower court's decision finding that R.C. 4112 does not expressly authorize an award of punitive damages against a political subdivision); *Core v. Champaign Cty. Bd. of Cty. Comm'rs*, No. 3:11-CV-166, 2012 WL 3073418, at *6 (S.D. Ohio July 30, 2012) (finding punitive damages not recoverable against political subdivision). The Court thus finds that Ms. Morningstar cannot recover punitive damages from the City.

Ms. Morningstar does argue that she can recover punitive damages from Defendant Zingarelli. As discussed above, the Court found Chief Zingarelli statutorily immune from the discrimination and hostile environment claims. Chief Zingarelli could be liable for intentional infliction of emotional distress, however, if Ms. Morningstar shows he acted with the requisite malice, bad faith, wanton misconduct, or reckless misconduct necessary to overcome immunity. "It is normally for a jury to determine whether an individual's action meet any of these categories." *Satterfield v. Karnes*, 736 F. Supp. 2d 1138, 1155 (S.D. Ohio 2010). Here, construing the evidence in light most favorable to Ms. Morningstar, reasonable minds could conclude that Chief Zingarelli was not entitled to immunity. *See MacNamara v. Gustin*, No. 17575, 1999 WL 355844, at *6 (Ohio Ct. App. June 4, 1999). It is therefore an issue for the jury.

## IV.    CONCLUSION

For the reasons stated above, the Court **GRANTS** Defendants' Motion for Summary Judgment on Counts I, III, VI, and VII as to the claims against Chief Zingarelli in his individual capacity; Count II as to negligent infliction of emotional distress claim; and Count IV in its entirety. The Court **DENIES** Defendants' Motion for Summary Judgment as to Counts I, III, VI,

and VII as to the Circleville Defendants; Count II as to intentional infliction of emotional distress claim; and Count V in its entirety[6].  Count VIII is hereby **MOOT**.

      **IT IS SO ORDERED.**

                                                                <u>s/Algenon L. Marbley</u>
                                                               **ALGENON L. MARBLEY**
**DATED: March 16, 2018**                      **UNITED STATES DISTRICT JUDGE**

---

[6] Though Defendants state that they are seeking summary judgment on all claims, nowhere in their motion do they mention Ohio Public Policy Tort or specifically move for summary judgment on that claim.  Neither party has briefed the issue.  Thus, the Court will **DENY** summary judgment as to **Count V**.